900

Mrs. Edith BOUDOIN, J. P. Boudoin, Jr., Johnny Boudoin, Mrs. Adeline Styron, Mrs. Greta Johnson and Sister Peter and Mark Richard, dba Boudoin and Richard,

v.

J. RAY McDERMOTT & COMPANY, Inc.

Civ. A. No. 6609.

United States District Court
W. D. Louisiana,
Lake Charles Division.

Sept. 23, 1959.

J. B. Jones, Jr., Cameron, La., for plaintiffs.

Faris, Leake & Emmett, New Orleans, La., for defendant.

HUNTER, District Judge.

This action arises out of damage to plaintiffs' wharf on the Calcasieu River at Cameron, Louisiana, resulting from the alleged collision of defendant's barge, Tidelands 5, during the height of Hurricane Audrey on June 27, 1957.

These are the facts:

(1) On June 25, 1957, the Tug R. Thomas McDermott took the steel barge, Tidelands 5, in tow in Sabine Pass, Texas, on a voyage for defendant's base at Bayou Boeuf in the vicinity of Morgan City, Louisiana. The voyage was to be made via the Gulf of Mexico and Atchafalaya River.

(2) The Tug R. Thomas McDermott was a steel seagoing tug 86 feet in length, 26 feet in beam, with a draft of 11 to 12 feet. She was powered by twin Enterprise Diesel engines of 700 horsepower each. Her crew on the occasion in question consisted of eight men. She was adequately equipped with several radios and radar.

(3) The Tidelands 5 was a large steel barge aproximately 272 feet in length, 72 feet in width, and 15 feet in depth with a draft of two or three feet in the condition in which she was loaded. She was loaded at the time with a drilling rig weighing 750 tons.

(4) At about 2:30 p. m. on June 25, 1957, the Master of the Tug R. Thomas McDermott received a radio message from defendant's base at Bayou Boeuf reporting there was a low pressure area, or beginning of a hurricane, in the Gulf, and ordering the flotilla to proceed to Cameron, Louisiana to tie up to the McDermott-Phillips Dock there and to stand by [1].

(5) The flotilla altered course, headed for Cameron, and arrived at 6:00 p. m. on June 25, 1957. There, the tug and barge were moored to the McDermott-Phillips Dock with eight doubled 6 or 8 inch Manila lines which were run from fittings on the barge to piles and cluster piles at the dock and in its vicinity. All lines were new or almost new. The Master reported in to his superiors that all was well and received no further instructions or communications from them.

(6) The McDermott-Phillips Dock is located on the southern side of an island (Monkey Island) surrounded by the Calcasieu River and the dredged Lake Charles ship channel. It is approximately a mile inland from the Gulf of Mexico and about one mile southeast of plaintiffs' wharf which was located on the north side of the Calcasieu River near the west end of Cameron and across the island

from the position of the mooring site of the Tidelands 5.

(7) There are few structures in the general vicinity of the dock. The Cameron area is flat country, barely above sea level. Nowhere in the area are there any bluffs or high banks. The Cameron village is the parish seat and the base of operations for shrimp, menhaden fishing, and off-shore oil activities.

(8) During the night of June 25–26, and throughout daylight on June 26, 1957, the weather at Cameron was not unusual. It was cloudy with some rain. The Master received constant weather reports by radio from several sources, including the marine operator at Galveston, Texas; and he also received all weather advisories issued by the United States Weather Bureau Office at New Orleans from June 25, 1957 through June 27, 1957. The reports during the night of June 25th and the daylight hours of June 26th indicated that Hurricane Audrey was brewing in the Gulf of Mexico, and at 10:00 a. m. on Wednesday, June 26th, the New Orleans Weather Bureau issued hurricane warnings for the entire Louisiana coast, and for the Texas coast as far west as Galveston. Hurricane advisories were continued at 3-hourly intervals forecasting high winds, tides of 5 to 9 feet above normal, and emphasizing that persons living in low places should move to high ground. Of course, no one anticipated the holocaust and tragedy that was to follow on this section of the Louisiana coast.

(9) During the evening of the 26th the weather began to get bad, with scattered showers and gusty winds. It was not until 7:00 p. m. on that date that the weather bureau became in any way specific as to what part of the coast the hurricane would strike. At that time it was stated that at its then present speed of 10 miles per hour it "would bring the center inland on the western Louisiana coast at about dark Thursday" (June 27,

1. The weather reports indicate that at noon, June 25, 1957, a hurricane watch was advised for the entire Texas and Louisiana coast. See Exh. Weather Bureau (1).

1957, Exh. Weather Bureau (1), pg. 8–9).

(10) The Master of the R. Thomas McDermott had at least two more double lines run from the Tidelands 5 to the dock and put out a very large anchor with flukes, which were four feet or more in width.

(11) At about 3:00 a. m. on June 27, 1957, the winds grew worse. The Master was called and he ordered a towline run from the stern of the R. Thomas McDermott to the Tidelands 5. From that time, the R. Thomas McDermott towed on this towline to relieve the strain of the Tidelands 5 on her mooring lines and their wharf structures.

(12) At about 8:30 a. m. on June 27th, the wind was blowing better than 100 miles per hour. The tide rose more than 13 feet above mean sea level, and a blinding rain was following. There was a tremendous current flowing in the channel which was heeling the R. Thomas McDermott to starboard as she pulled full ahead with both of her engines on the towline to the barge. At about this time, the Tidelands 5 went over the dock and started in a northwesterly direction inland across the island. The inland movement of the barge was dragging the R. Thomas McDermott toward the island, despite her full ahead speed, and thereby jeopardizing the lives of her crew. The Master of the R. Thomas McDermott said, "if I had held on to it (barge) and the boat would have hit the bank, it could have turned over and I would have probably drowned myself and the men, so, to save the boat and the men, I let the barge go. I had to let it go to keep from going on the bank, so I cut the towline at 8:30 and it (barge) went across the island, and that is the last I seen of it until I went and seen it down on the bank [2]."

(13) Defendant urges that the plaintiffs have not borne the burden of proving that the Tidelands 5 did any damage to plaintiffs' dock, but plaintiffs have produced two witnesses, Gilmore and Guy Marshal, and we find from their evidence that the wharf was struck by the Tidelands 5. Mr. Guy Marshal, at the time he observed the barge hit the dock, was holding on for dear life in the water on the top of a telephone pole.

## Discussion.

Plaintiffs' only contention of fault is that the barge Tidelands 5 should not have been moored in Cameron harbor, but should have been moored in Lake Charles. Plaintiffs concede that the Master of the vessel did all that he could do, under the circumstances, after he found himself caught in Cameron, but plaintiffs insist that the Master and the owner committed a glaring error in permitting the vessel to be moored in Cameron under the circumstances. They insist that the standard of conduct required of a Master and an owner under such circumstances required the removal of the vessel to safety in the Lake Charles area.

Defendant urges that the collision, if it did the damage, was not the result of any fault on the part of defendant, but was the result of Hurricane Audrey, an act of God.

Hurricane Audrey was recognized and located for the first time on June 25, 1957 at noon, when it was 380 miles southeast of Brownsville, Texas. At that time all interests along the Texas and Louisiana coasts and in the Gulf of Mexico were advised to keep a hurricane watch [3]. Following this report, the R. Thomas McDermott flotilla put into Cameron to await development of the weather situation. At 10:00 a. m. on June 26, 1957, the weather bulletin advised that hurricane warnings should be hoisted on the entire Louisiana coast, and it was not until 7:00 p. m. that day that the weather bureau was in any way specific as to where the hurricane would strike the coast, and then that bulletin said only that the center would reach the west

2. Allen Marshal, p. 12 (parenthesis added).

3. See Exh. Weather Bureau (1).

Louisiana coast about dark on Thursday [4].

We do not believe that the Master of the R. Thomas McDermott could be expected to anticipate that the hurricane was going to specifically hit the Cameron area at least until the evening of June 26th [5]. The Master of the vessel explained his Cameron stay as follows:

"Q. On the evening of the 26th of June, when you realized that the hurricane was likely to strike the Cameron area, why didn't you attempt to move the R. Thomas McDermott and that tow from the area? A. Well, a number of reasons, was the reason I didn't; for one thing, I thought I was just as safe where I was at, I didn't know, I thought I was at a good dock and I was safe, and then, if I had proceeded up that channel with that thing in tow and that storm would have caught me between there and Lake Charles, well, I would have really been in trouble. I would have probably lost my boat and my crew. And also then, if I had got to Lake Charles, I don't know where I would have tied up, I might have been in worse shape up there than I was down here, so I figured myself, I was in a good place, the reason I didn't move.

"Q. Why didn't you move before that time? A. Well, I didn't know where the thing was going to come in shore at."

The Master thought of the suggestion that he go to Lake Charles:

"* * * I might have been in worse shape up there than I was down here, so I figured myself I was in a good place, the reason I didn't move." [6]

We agree with defendant that the Master was not guilty of any gross and flagrant fault in the exercise of his judgment. We believe that his judgment was reasonable under the circumstances. Certain exhibits are of interest in this connection:

"Greatest damage extended from Sabine Lake to Cote Blanche Bay with extensive damage and northward into La Salle Parish. *The cities hardest hit were Cameron and Lake Charles, Louisiana, and Port Arthur, Texas.*" [7] (Emphasis added.)

"Gusts of wind near or exceeding 100 m. p. h. were reported at a number of locations along the coast. A maximum gust of 105 m. p. h. at 9:40 A.M. (C.S.T.) was recorded on the Cities Service Corporation's wind dial located 10 miles to the west of Lake Charles." [8]

### The Law.

(A) Plaintiffs are of course correct in their assertion that "when a fixed structure is struck by a moving vessel, a presumption of negligence arises and the burden of proof is on the owner of the vessel then to show that the collision was not the result of any negligence on the part of the owner or master [9], and it is well settled that the burden of prov-

---

4. See Exh. Weather Bureau (1), pg. 8–9.

5. Allen Marshal, Pages 9 and 10. This was when the weather bureau stated the hurricane would hit "West Louisiana." There were hundreds at Cameron who did not realize the hurricane would strike there, judging by the hundreds who remained there and lost their lives.

6. Allen Marshal, Page 20. It was impossible to go north to Lake Charles into the intercoastal waterway, as the Tidelands 5 is too wide (72') and would have blocked that channel.

7. Exh., Weather Bureau, 2, p. 1; see also, "Area of Heaviest Damage" Figure 2, p. 4 and Reverse Side, Exh., Weather Bureau 3.

8. Ibid.

9. Plaintiffs' attorney contends in these circumstances that the master of the R. Thomas McDermott had ample warning to take the Tidelands 5 to Lake Charles, that because he did not do so, he was at fault and that, accordingly, defendant should be liable. Publicker Commercial Alcohol Co. v. American-Hawaiian

ing inevitable accidents is heavier upon the party asserting that defense.

█ Here, defendant has gone forward with the evidence and explained the circumstances of the accident. The presumption of fault created by reason of the barge having collided with the dock has been overcome [10]. The hurricane was an Act of God; the hurricane was beyond the control of man.

(B) *Master's Judgment*. The decision of this case rests on the answer to one question: Under the circumstances here present, was the Master of the tug guilty of actionable negligence in the exercise of his judgment in leaving the barge Tidelands 5 at Cameron rather than moving it to Lake Charles.

█ The courts have consistently refused to charge actionable fault on the part of masters in exercising discretion with respect to maneuvers in storms, and the approach thereof, unless there is flagrant abuse of that discretion. This rule was well stated by the Supreme Court of the United States in The Grace Girdler, where the court said:

> "The highest degree of caution that can be used is not required. It is enough that it is reasonable under the circumstances—such as is usual in similar cases and has been found by long experience to be sufficient to answer the end in view—the safety of life and property." [11]

In Alice Moran-Imoan [12], the Second Circuit Court of Appeals through Judge Learned Hand stated the proposition thusly:

> "But we cannot charge a master because it seems to us, who were not there, that another choice would have been better. Only in the case his conduct is outside the range of

possible discretion, may we hold him for lack of seamanship; error to become *fault must be gross and flagrant*."

The Fifth Circuit Court of Appeals, in United Geophysical Company, Inc., v. Vela, 231 F.2d 816, 821, had occasion to consider a case involving fairly analogous circumstances. However, there, the actual decision of the case turned on the finding by the court that the plaintiff had not proven that the collision of the structure was due to its having been struck by the vessel. Note the following language of Judge Brown:

> "And it is here that Vela's claim fails for nought but the collapse of the structure and presence of this vessel in the midst of the wreckage is shown, and this is insufficient. United States v. Waterman Steamship Corporation, 5 Cir., 190 F.2d 499, 1951 A.M.C. 1291; Pacific Coast R. Co. v. American Mail Line, 25 Wash.2d 809, 172 P.2d 226, 1946 A.M.C. 1340. As on any other plaintiff the burden rested on him to show damage proximately caused by lack of due care.

> "Damage by the vessel is not even shown. When it is recalled that water driven by winds of over 100 MPH rising to unprecedented heights above the level of both docks and near or over the shed floor was lashing with great fury at these old structures, and not a single witness did (or could) testify that the buildings collapsed upon, not before, being hit by the King Bell, the inferences at best are in balance."

However, in Vela the court did proceed to consider the duty of the master to seek proper shelter in conditions somewhat analogous to the case here. In Vela, sev-

---

Steamship Co., 1946 A.M.C. 1518; The Louisiana, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85; The Severance, 1933, A.M.C. 128, 152 F.2d 916; Swenson v. Steamship Argonaut, 3 Cir., 1953, 204 F.2d 636, 1953 A.M.C. 1585.

10. We reiterate that there is no charge of fault other than that the Tidelands 5 should have been moved from Cameron.

11. 1869, 7 Wall. 196, 74 U.S. 196, 204, 19 L.Ed. 113.

12. 2 Cir., 67 F.2d 603, 605, 1933 A.M.C. 1626, 1630. Emphasis added.

eral luggers engaged in geophysical exploration in open Breton Sound took refuge in a channel off the east bank of the Mississippi River and tied up to a privately owned sea wall during the September hurricane of 1947. During the height of the storm the vessels broke adrift and allegedly collided with shore structures and damaged the sea wall. The plaintiff, among other things, contended that the luggers should not have tied up where they were, but should have gone to some other place under the circumstances. The court, in considering whether or not the masters of the luggers were at fault for their action in this respect stated:

"But navigation in these circumstances is left neither to Judges nor the Elder Brethren of Trinity House nor those who, in the garb of experts, from the security of a swivel chair now lay out the course with great conviction. 'The master is the commander of the ship—lord of his little world. He is master in every sense of the word * * *'. The Balsa, 3 Cir., 10 F.2d 408, 409. Whether he has bridge or quarterdeck to stalk, as long as he commands, he is master. It is the Master, then, who must make these decisions and who, clothed with great responsibility, enjoys the greatest and widest of good faith latitude in professional judgment. 'The fundamental principle in navigating a merchantman, whether in times of peace or of war, is that the commanding officer must be left free to exercise his own judgment. Safe navigation denies the proposition that the judgment and sound discretion of a captain of a vessel must be confined in a mental strait-jacket. * * *' The Lusitania, D.C.S.D. N.Y., 251 F. 715, 728.

"With the lives of their crew, and their own, hanging in the balance as their decision was wise or unwise, with the possibility of some character of property damage or loss bearing largely as one of the alternatives in the paramount concern for safety or life, the decision of whether to leave or ride it out, seek shelter and if so where, was by the necessities of a well-named cruel sea committed irrevocably to these Masters. Their decision was prudent. Indeed, it is not shown to have been wrong at all.

* * * * * *

"Faced with this impending storm of predicted but immeasurable violence, the considerations which approve the decision to seek shelter come into play in the selection of the precise place and the method of mooring. It was the threat of this hurricane striking them at sea which justified their going inside. But in shelter, they were still in its projected path. It was proper that with that mysterious and portentous force loose in the heavens, the Masters should choose the place where the vessels and crews would have the maximum protection. In that situation, on that public waterway, faced with those perils, the vessels had as much right to be where they were as did Vela's dock and structure. Reasonable care under those trying conditions was indeed imposed on the vessels, but if in the good faith judgment of their Masters, this was the spot best suited to afford protection against imminent peril, they did not need to withdraw to other places merely because the docks were nearby or might be damaged as the storm lashed the vessels about."

### Conclusion.

The court concludes that under all the circumstances here present, the Master of the McDermott tug was not guilty of actionable negligence under the circumstances. He and his crew are alive, and the tug is undamaged. The court takes judicial notice of the fact that numerous unfortunate residents and vessels with the same information which the McDermott master had elected to remain at Cameron. Judgment of the decisions of reasonable men should be based on the

actions of others faced with the same circumstances. On that basis, there is no greater support that the master's decision was far from culpable from the record of the holocaust and tragedy at Cameron left in the wake of Hurricane Audrey.

There should be judgment for the defendant. There is. Appropriate decree should be presented.