OHIO BARGE LINE, INC., Claimant, Appellant,

v.

OIL TRANSPORT COMPANY, Inc., Appellee.

No. 18230.

United States Court of Appeals
Fifth Circuit.

July 6, 1960.

Geo. B. Matthews, Lemle & Kelleher, New Orleans, La., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for Ohio Barge Line, Inc., appellant.

Cornelius G. Van Dalen, New Orleans, La., for appellee, Deutsch, Kerrigan & Stiles, Christopher Tompkins, New Orleans, La., of counsel.

Before HUTCHESON, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Indigenous to the Mississippi-Ohio River system, the parties inject a note of romance into this otherwise run-of-the-mill collision case. The appellant, carrying the heavy burden of overturning fact findings and a decree of sole fault sets the stage by its opening line. "On a cool, clear night in April of 1956 the Steamer Lunga Point was bound down the Ohio River with a tow of seventeen (17) barges." With great earnestness, but with an acknowledged realism befitting its skilled advocates, it then asserts that a review of the record and particularly the testimony of appellee's own witnesses and certain physical facts

should convince us that the disposition of the case was clearly erroneous. To this main theme appellee rejoins even at the possible risk of mixing up the figuratives, that this is just "another fact appeal in admiralty in which the losing party" is "softly whistling in the shadow of McAllister vs. United States [348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20]."

 In viewing this as one in which fact findings are crucial both are right. Not a single, important or novel law point exists or is scarcely worthy of mention once the fact is found. And in concluding that the appellant fails in its valiant effort, we do this not because we regard McAllister as paralyzing us from our "eventual responsibility for the facts as well as for the law," River Terminals Corp. v. Southwestern Sugar & Molasses Co., 5 Cir., 1960, 274 F.2d 36, 37. Rather, we are satisfied that in this kind of controversy functions of the courts in the judicial hierarchy are distinct and different, and we undermine the vitality of the system by a too-quick meddling in the principal business of a trial court. A trial of a hotly contested, sharply disputed case is the task of a trial court. Whether formulated in the mold of "clearly erroneous" or followed intuitively as a measure, reviewing courts, even in admiralty where the opinions often spoke of trials de novo, should be slow to overturn fact decisions made by the judge before whom the facts are annealed through the hammering, heating process of vigorous, running advocacy. If we were to approach it as simply a question—how should this case be decided?—we would effectually bypass a trial court. The problem faced is more nearly that of determining whether the trial judge, faced with the choice—often hard choices between competing versions of simple or complex occurrences—has fairly weighed the matter and has reached a conclusion which seems substantial and reasonable even though another result might have been achieved either by him or others. In this approach it is our view that the District Court's findings neither should, nor may, be disturbed in this case.

The vessel held solely at fault was the downbound steam tug Lunga Point. Her tow collided with that of the upbound diesel tug Bayou Plaquemine in the Ohio River below Broadway Hollow Light (Mile 559.0) at approximately Mile 559.7. The River, at this place, runs substantially east-west and below Broadway Hollow Light it has an easy bend to the south. The Lunga Point, downbound, therefore had a left bend, the Bayou Plaquemine, upbound, a right bend. The River is approximately 1600 to 2000 feet wide. Located upstream, and of importance here, is the Madison Highway Bridge (Mile 557.3) crossing the River from Meridian, Indiana, on the north bank to Milton, Kentucky, on the south.

The Lunga Point, a large DPC steam tug, was pushing a tow of 16 cargo barges, 4 abreast, in 4 tiers. The flotilla was close to 900 feet in length with a beam of 104 feet. The Bayou Plaquemine, smaller but still amply powered, was pushing a tow of 4 oil barges with the flotilla having an overall length of 660 feet. Against a 3 mph current, she was making 3 to 4 miles per hour over the ground. The Lunga Point with a current underfoot at full ahead was running about 10 mph through the water. The sailing line on the U.S. Engineers' chart follows this course. It passes under the highway bridge approximately 200–300 feet off the Indiana shore. It then angles toward the Kentucky side in the direction of Broadway Hollow Light at which point it is approximately 500–600 feet off the Kentucky shore. It then broadens out somewhat in the bend so that in the southerly reach it is substantially in the center of the river.

There are a number of things virtually uncontradicted. The collision occurred about 200 to 300 feet off the Kentucky shore. The starboard forward corner of the Lunga Point's lead barge on the starboard forward end of the tow struck the port forward corner of the lead barge of the Bayou Plaquemine causing substan-

tial damage and the sinking of this oil barge. The forward rake end of the lead barge immediately next to the starboard forward barge of the Lunga Point also sustained damage undoubtedly from the oil barge scraping along after initial impact. Each tug and tow was angled in toward the Kentucky shore thus presenting the port forward corner of the Bayou Plaquemine's tow to the starboard forward corner of that of the Lunga Point. The physical damage, contrary to Lunga Point's contention, does not establish anything more.

Except for a more abrupt swing toward the Kentucky shore in the jaws of collision, the Lunga Point was in that position close to the Kentucky shore as a matter of deliberate action. She was angling from the bridge to the point with the intention of passing the point close at hand. She was trying to stay out of the bend. What caused the collision, she asserts, was that the Bayou Plaquemine suddenly changed course from close by the Indiana shore to cross Lunga Point's intended path, and also failed to carry out an agreed starboard to starboard passing agreement. The trial court, in a variety of specific findings, rejected this to hold the Lunga Point at fault for persisting in a starboard to starboard passage without proper concurrence and in crowding down on the Bayou Plaquemine then well on her own (Kentucky) side of the river.

The key to this case as the trial judge saw it, and as we too see it, was the position and course of the Bayou Plaquemine. According to the Lunga Point, some time after she had passed under the bridge, she noticed an upbound tug with tow deep in the bend over near the Indiana shore. As there is risk in a large downbound tow falling off onto the Indiana shore if she gets too far into the bend, her purpose was to hug the point to pass 300 feet or so off the Kentucky shore. The position of the upbound Bayou Plaquemine made this easy and safe. No passing signals had been exchanged either by the ascending vessel required to initiate them or by the descending vessel required to assent or otherwise indicate dissent. Rule 18, Western Rivers Rules, 33 U.S.C.A. § 343. After proceeding on her angular course toward the point, the Lunga Point when 1 to 1¼ mile away from the Bayou Plaquemine saw the Bayou Plaquemine suddenly change her course to one substantially at a 45 degree angle across the river toward the Kentucky shore and across the head of the Lunga Point's tow. When she saw this, the Lunga Point immediately blew a danger signal of several short blasts followed by two blasts proposing a starboard to starboard passing which, she said, was immediately assented to by the Bayou Plaquemine. In addition, she put her engine on full astern and attemped to throw her head further in toward the Kentucky shore to effectuate the starboard to starboard passing.

Except for the continuous course of the Lunga Point angling across toward the Kentucky shore, this story is hotly disputed by the Bayou Plaquemine. She insists that she was near the center or slightly toward the Kentucky side of the river at the time she first picked up on her radar the Lunga Point coming through the bridge. She continued on upstream angling in ever closer to take the point. There was ample water for a port to port passing, and she blew a one blast signal to the Lunga Point for such a passing. When this was not answered, she reduced her engine speed and when the tows were half a mile apart, she blew a second one blast at which time she uncoupled her engines. It was not until the head of the two tows were approximately 700 to 800 feet apart that the Lunga Point blew any signals, and then it was a four blast danger alarm followed by two blasts proposing a starboard to starboard passage which was then out of the question.

If as Lunga Point contends, the Bayou Plaquemine was well on the Indiana side and suddenly changed heading toward the Kentucky shore across the course of the cumbersome tow then descending at a rate in excess of 900 feet per minute,

the fault of the Bayou Plaquemine would be glaring. On the other hand, if this claim of the Lunga Point is not established, it puts her crowding the smaller tow whose presence was well known and, worse, condemns her for persisting in a starboard to starboard passage without assent and under circumstances which were most foolhardy. In contrast, all the other faults of Lunga Point fade off into inconsequential trivia.

This, of course, turns on credibility which includes more than sifting of evidence to discard that consciously untrue. It includes the vagaries of estimates of position, of relative position, of angles, of distances and speed compounded, as it was, by darkness and two objects moving in relation to each other. To this would be added the conscious or unconscious tugs of self-interest and that peculiar nautical loyalty which leads crew members who would otherwise quickly institute serious litigation against an owner at the mere drop of a marlinespike to stand by the ship. Recognizing that we have no way to evaluate such likely factors on the trial judge's conclusions, the Lunga Point urges extrinsic facts which, they insist with much earnestness, demonstrate that this basic conclusion simply cannot be supported.

The first is the attack on the initial position of the Bayou Plaquemine when the Lunga Point commenced to navigate with respect to her. The process runs this way. The Bayou Plaquemine's version shows she first picked up the Lunga Point on radar at a distance of 2.8 miles. Putting the Bayou Plaquemine, where she says she was, in the center or on the Kentucky side of the center of the river at a position 2.8 miles distant from the bridge puts her at a place where physically she could not have seen the Lunga Point. This is because at this bend and near Broadway Hollow Light the bank rises to a bluff several hundred feet in height. Since radar is a direct reflection and, like the human eye, cannot "see" through objects, the conclusion is asserted that this proves that the Bayou Plaquemine must have been considerably

to the left, i. e., toward Indiana, of her claimed position. Of course, this sort of argument is no beter than the irrefutable nature (or lack of it) of the critical physical elements. Several here suffer from the same sort of variables as most observations. There is, first, fixing the distance at 2.8 miles. True Bayou Plaquemine may be "bound" by it in the sense that she vouched for her master. He had earlier in the Coast Guard hearing estimated the distance at 3 miles and in making it more precise here, his testimony shows that there was no marker on the radar screen between the two-mile and the four-mile ring. This necessarily required an estimate by him, and that is what the 2.8 figure was. Next, the Lunga Point sought to establish these physical facts by the topographical map prepared by the U.S. Geological Survey. Assuming its accuracy, its application depends entirely on laying off this information onto the navigation chart and, more important, onto the river itself. In this respect considerable doubt is raised by an aerial photograph offered as an exhibit by the Bayou Plaquemine. By the use of a straightedge running from the fixed position of the Lunga Point coming through the bridge, the aerial photograph permits the position of the Bayou Plaquemine 2.8 miles distant to be substantially where her witnesses put it and still be within the radar's line of sight. Finally, the star independent witness, Mr. Furnish, by deposition, as much as testified that the bridge would be visible from this assumed position.

The second is the attack on the trial court's findings on who blew what signals when. The Lunga Point offered most unusual testimony in partial support of her version. For a maritime collision occurring in the dark of night on a big river running through two small towns, one would scarcely hope to find an independent bystander at 1:00 o'clock in the morning. The Lunga Point found the next best thing—not a by*stander*, but a reclining one then in bed but not, so he said, asleep, and who, from long service as a marine engineer, was experienced in

listening to and interpreting ships' whistles. We have no doubt of the evident sincerity of Mr. Furnish and his purpose honestly to tell only that which he honestly believed took place. But having said as much, this is far from concluding that his status as an independent witness, i. e., not beholden to either party, or his general maritime experience as a whistle-listener-toer compelled the District Judge to accept his recital. He had retired at 10:30 p. m. and this took place near 1:00 a. m. He was not, he said, asleep. But how sleepy was he, or had he been? When had he really awakened? Was the first whistle heard while in a state of full consciousness, or was this, or may it have been, part reverie?

More important, the story he had to tell on the sequence of whistles to bolster a like theme from the Lunga Point was pretty well scuttled by the preposterous testimony from the Lunga Point's master which the trial judge in more ways than one then and there rejected out of hand as simply unworthy of belief. According to Mr. Furnish, out of the stillness of the night, he heard a single blast on an air horn—all agree this would be from the diesel tug Bayou Plaquemine. Oddly enough, in relation to what next occurred, this corroborates the exact sequence urged by the Bayou Plaquemine commencing with her second one blast signal for a port to port passing. Within a matter of 30 seconds after the single blast, he then heard on a steam whistle (obviously from the Lunga Point) several short blasts which he took as a danger signal followed 30 seconds later by a two-blast signal proposing a starboard to starboard passing. To this, he then says, the Bayou Plaquemine air horn answered with two blasts indicating acceptance of the proposed passage. This was, however, followed within three or four minutes, he estimates, by the sound of collision as the ratchet cables were parted and the tows broke up.

Several things work against this version. Mr. Furnish sensed trouble. After hearing the danger alarm and the two blasts which were assented to by the Bayou Plaquemine, he got out of bed, went through his house to the front porch where, like the pilot in O/Y Finlayson-Forssa A/B v. Pan Atlantic Steamship Corp., 5 Cir., 1958, 259 F.2d 11, 18, footnote 15, 1958 A.M.C. 2070, 2079, he had practically a ringside seat. He could tell that the engines on the Lunga Point were going astern. All this makes so unlikely the asserted two-blast signal from the Bayou Plaquemine assenting to a starboard to starboard passage or, more important, the existence of a genuine belief by the Lunga Point that such a passage either should be proposed or could be carried out safely.

But it was the captain of the Lunga Point who was to be the undoing of this story. On direct examination he repeated the sequence set forth in the pleaded version of the Lunga Point. On cross examination he had to acknowledge that in the prosecting hearing held by the Coast Guard but a few hours after the collision he testified that the tows were half a mile, not one and one-half mile as stated in his court testimony, when he blew the first danger signal followed by the two blasts. Pressed for an explanation, he ventured the suggestion that while he must have stated these words, it probably referred to the blowing of danger signals at other times. Right out of the blue he then volunteered that he blew the danger signal three times and each time followed it with a two-blast signal. This was new information not theretofore revealed to the Coast Guard or to the Court in pleadings or on direct examination. A part of this story was also his assertion that it was 8 to 10 minutes from the time he blew the danger signal and put his engines on astern until collision occurred. No one on his ship corroborated the master. The mate, standing some kind of a watch when he was not engaged in a more or less continuous nautical coffee break, heard but one signal and the engineer on watch who could hear nothing except whistles from the Lunga Point herself heard but one danger signal. Both fixed the time be-

tween that danger signal and impact in the neighborhood of three to four minutes—a time which, according to the master and based on tests subsequently made, was insufficient in point of time and distance to permit the vessel to stop as he claimed her to have been. The trial court was entitled to conclude that someone was awfully careless with the truth or with observations. If the captain had blown all of the signals he claimed, it would have shattered the peaceful quiet of Madison making it sound to an attentive listener like Mr. Furnish more like a steam calliope on an old river showboat. If they didn't take place, as the court obviously found they did not, this pretty generally destroyed the trustworthiness of the captain as the source of truth on any critical point.

That leaves, then, only the attack on the custom to be followed by an upbound and downbound tow. The Lunga Point tendered an obviously competent, experienced pilot and master familiar with these waters. In brief his thesis was that an upbound tow such as the Bayou Plaquemine should stay on the Kentucky side holding to the point while making the bend to the right. The downbound tow, on the other hand, should follow generally the sailing line angling from the bridge over toward the point at Broadway Hollow Light holding as close as reasonably possible to the point to prevent getting out into the bend where the current might make the tow fall down on the Indiana shore. The difficulty with this theory was that this is what the Bayou Plaquemine was doing. And this expert acknowledged that in such a situation it was still expected that the vessels pass port to port, not starboard to starboard. Of course, such a maneuver could not safely be executed if the downbound tow, such as the Lunga Point, with a beam of 104 feet was but 300 feet off the Kentucky shore. The trial court was scarcely required to accept the argumentative conclusion of this expert that there either was a custom or such a custom would be acceptable requiring that the upbound tow stay as close as 10 feet to the Kentucky shore to permit the downbound tow to stay out of the bend. The theme was built upon the hypothesis that the downbound tow would stay $\frac{1}{4}$ to $\frac{1}{3}$ of the width of the river off the Kentucky shore. On her own story, the Lunga Point, crowding in on the upbound tow, was violating the custom herself.

After resolving this critical issue of credibility, all else falls. We find nothing in the other points urged.

The case ends as it began—a hotly controverted dispute over what took place. The judge resolved that in favor of the Bayou Plaquemine, and all we have done is to demonstrate some of the reasons why this is plausible and reasonable. There, without any elaboration about the Rules of the Road or court decisions enunciating prudent steps for navigation, it ends.

Affirmed.