**ELLIS TOWING & TRANSPORTATION CO., Appellant,**

v.

**SOCONY MOBIL OIL COMPANY, Inc., Appellee.**

No. 18705.

United States Court of Appeals
Fifth Circuit.

June 23, 1961.

Rehearing Denied July 19, 1961.

92

George W. Brown, Jr., Beaumont, Tex., for appellant, Brown & Fulbright, Beaumont, Tex., of counsel.

Samuel C. Lipscomb, Beaumont, Tex., for appellee.

Before CAMERON, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The overtaken vessel is appealing from a decree holding her guilty of mutual fault with the overtaking ship. The overtaking vessel, perhaps still unconvinced and undoubtedly unhappy, nonetheless acquiesced and no longer challenges the finding of fault against her. The sole controversy, then, is whether the overtaken vessel was guilty of any fault proximately causing the sinking. We conclude that the District Court erred and reverse. But in doing so, we do not credit that which the Judge discarded or reject that which he accepted. Disdaining any claim that we may, or should, retry the variables and nuances of this extended evidence, we give full range to the clearly erroneous concept formally promulgated under F.R.Civ.P. 52(a), 28 U. S.C.A. which, like some marine life, is now incrusted on the admiralty. McAllister v. United States, 1954, 348 U.S. 19, at pages 20–21, 75 S.Ct. 6, at pages 7–8, 99 L.Ed. 20, 1954 A.M.C. 1999; Bisso v. Waterways Transportation Co., 5 Cir., 1956, 235 F.2d 741, at page 743, 1956 A.M.C. 1760; Societa Anonima Navigazione Alta Italia v. Oil Transport Co., 5 Cir., 1956, 232 F.2d 422, at pages 423–424, 1956 A.M.C. 1073.

This simplifies greatly the brief review of the facts. The overtaken vessel is the Tug Lu Ann, a small 300-H.P. tug 45 feet long, 14 feet abeam of shallow draft and a one-foot freeboard aft. On the occasion of the sinking, she was towing on a 65-foot bridle and tow line three barges in tandem. The barges were light and riding high out of the water. The barges varied in width from 35 feet for the lead barge down to 28 feet. The lead barge was a chemical carrier with tanks on her deck. The tow had an overall length of about 650 feet. With the barges light, and the tug small and low in the water, it was impossible for the man at the wheel of the tug to see the tail end or alongside the tow. As occasion required, the tug would swing out slightly to her port or starboard to afford a view of the after end of the tow.

While the tow was westbound in the Sabine-Neches Waterway about 2:50 a.m. on November 16, the SS Saconnet was also westbound at a speed which would overtake the tow. The Saconnet is a T–3 tanker 501 feet in length. She was heavily laden with a draft of nearly 30 feet. The night was dark, cold, and there was a light drizzle. Visibility, however, seemed to be good. The Tanker had no difficulty in making out the lights of the Lu Ann which indicated that it was a tug pulling a tow. A brisk north wind of approximately 20 mph was blowing. It was known, therefore, that the wind would push the light barges toward the south bank so that the Saconnet would have to overtake the tow on the starboard side. About five minutes before the sinking the Saconnet blew a one-blast signal. She was then approximately three to four ship lengths from the stern of the tail barge. The channel in this area is quite wide, but to avoid some anticipated shoaling on the starboard (north) side, the Saconnet held to the middle or just to the left of the center of the deep water channel.

The Tug in the meantime became aware of the overtaking vessel. Those on the Saconnet insist that the Lu Ann replied shortly by a one-blast signal. The mate on the Tug denies hearing the Saconnet's one-blast request but admits that since he knew the ship was overtaking and it appeared to be safe, he sounded a one-blast signal on the Tug. Presumably he meant this as an invitation. As the Saconnet made her way along the side of the tow the overtaking continued to look safe even though it was evident that the wind was holding the light barges toward the south bank. The Tanker continued on, and when those on her bridge were abeam the forward end of the tow and could make out the Tug, the Tug was angling to her starboard on a heading toward the center of the canal. While in this heading, the Tug Lu Ann rolled way over to her port side and within moments sunk.

The Saconnet's theory below—to which she tenaciously adheres before us despite

the contrary finding of the District Judge —was that the action of the Tanker had nothing to do with this capsizing and sinking. According to the Saconnet the Tug, either from trying to put herself in a position where her mate could see how the tow was trailing, or out of difficulty in holding the tow off the south bank, found herself in a position where the forward movement of the barges putting stress on the short bridle caused the Tug to jack. On this theory, it did not matter whether the lead barge actually hit the Tug before she went down. Under this explanation the presence of the Saconnet was purely coincidental.

■ The trouble with that as a legal defense is that the Court would not accept it in fact. On the contrary, the Court expressly found that the Saconnet had been guilty of a double fault: she had run too fast and too close by the overtaken tow and Tug. No challenge of such conclusions may now be asserted by the acquiescent Saconnet. Nor could it be done on the evidence were she not bound by a decree from which no appeal has been taken. The speed made good over the preceding 2.3 miles averaged 7.3 knots. And despite some shoaling expected on the north side of the channel, there was some 370–380 feet of 30-foot deep water between the point where the Tug sank and the north edge of the deep water channel. There was thus no need to shave by at 75 to 100 feet.

It is important to bear in mind that it has been judicially and irrevocably determined that the speed and position of the Tanker contributed to cause the sinking. It was not, as the Saconnet asserted, the tripping of the Tug by the on-moving barges close-coupled by a short bridle. And it is against that situation that the findings of fault on the Tug's part must be assayed. The Judge found that the Tug Lu Ann was at fault because she was insufficiently manned, the person at the wheel was unable to see the after end of the tow without changing the direction of the Tug, and she failed to keep a proper lookout toward her stern. In one way or the other these all revolved around the undisputed fact that with but a three-man crew, two of whom were off watch asleep, the mate at the wheel could not do either of the things the Saconnet contended were then required. First, he could not keep a lookout astern for this Tanker then known to be overtaking the tow, and second, at the moment preceding the capsizing he could not cast off the tow line.

■ On the latter point of action taken *in extremis*, there is nothing to support a causal relation between the failure to cast off the tow line and the sinking of the Tug. What happened was really just short of a miracle, at least in terms of life. When the Tug rolled over on her port side, water running in the crew's quarters abaft the wheelhouse awakened the deckhand then off watch. He in turn awakened the master and both raced out of the narrow doorway and through the wheelhouse. Whether for a moment all three were out of the wheelhouse, and the wheel thus unattended, seems unimportant for all agree that the Tug was practically floating on her port side. In any case the master and deckhand, making their way aft by walking on the starboard side of the housing, now horizontal, hurried to the towing bitt to cast off the line. There is a dispute among them whether this was successful. But it does not matter, for all—those on the Tug and on the Saconnet with their ringside seat, O/Y Finlayson-Forssa A/B v. Pan Atlantic S.S. Co., 5 Cir., 1958, 259 F.2d 11, at page 18, note 15, 1958 A.M.C. 2070; Ohio Barge Line, Inc. v. Oil Transport Co., 5 Cir., 1960, 280 F.2d 448, at pages 451–452, 1961 A.M.C. 375; Boudoin v. J. Ray McDermott & Co., 5 Cir., 1960, 281 F.2d 81, at page 87, note 3; Id., D.C., 176 F.Supp. 900, 1960 A.M.C. 1884—agree that the Tug never righted herself and immediately went down. The Tug in her final agony, afloat on her port side, did change heading more abruptly to the right so that she was headed almost east. It may be assumed that stress on the tow line may have caused this.

But even so there is no proof, factual or expert, which would permit a finding that the failure, if such it were, to cast off the tow line in those moments would have kept the Tug from sinking.

But that still leaves the question whether prior to the moment of agony, the likely necessity of emergency action of this or some other kind should reasonably have been anticipated. This really bears on the fundamental issue of whether, as the District Judge thought, the Tug had a duty to keep a lookout astern. We put it in this fashion because if there was such a duty, the Tug was guilty of a palpable fault from being insufficiently manned. The man at the wheel could not, of course, double in brass as a lookout whose sole duties must be confined to being the eyes and ears of the vessel. Griffin On Collision, § 109 at 277 (1949). Nor could he supply the hand by which to perform other services as occasion might demand since this would amount to leaving the rudder and engine movements of the Tug and tow unattended. June T., Inc. v. King, 5 Cir., 1961, 290 F.2d 404.

■■ But as to the stern lookout, the charge and finding fails on two counts. First, there was no duty under these circumstances, and second, the Saconnet does not demonstrate that such failure could have been a cause of the sinking. There are, of course, circumstances under which a vessel must keep a lookout astern. These include movements of the vessel in that direction and, where appropriate, actions which are likely to imperil the safety or encumber the navigation of vessels known to be astern. Griffin, supra, § 108 at 275. But it is equally clear that an "overtaken vessel, showing a proper stern light at night, is not ordinarily obliged to keep watch astern so long as she holds her course." Griffin, supra, at 276. This flows primarily from the nature of the obligations imposed on the overtaking and overtaken vessels. The elemental principle, not challenged here by the Saconnet, is that while the overtaken vessel must hold course and speed, the overtaking ship has the imperative duty to so navigate as to keep clear until the maneuver is completed. Griffin On Collision, §§ 52–56, 61, 63–65 at 158–165, 170, 176–191. We may assume that the general prudential rule might well impose a burden on the overtaken vessel to take appropriate action to warn the overtaking ship of situations arising subsequent to the mutual assent and of which the overtaking vessel might not have the means of knowledge. But in the absence of similar circumstances there is no duty on the overtaken vessel to keep a lookout astern to see whether the overtaking ship is complying with her mandatory duty to keep clear.

■ Consequently, the Tug Lu Ann was entitled to assume that the Saconnet would make the overtaking safely. The only condition imposed was that she hold course and speed. That correlative duty rests on the practical necessity that the vessel having the imperative duty to keep clear must be able to rely on the expectation that the favored ship will do nothing which encumbers or embarrasses or impedes or imperils the maneuver. The changes in course and speed forbidden by the rule are of that kind. It is not a mere matter of words. Hence the reduction in the speed of the Lu Ann's engines was not a violation. On sounding the one-blast signal either as an invitation or an assent to the known overtaking ship, the Tug reduced her engines from 1400 to 1200 rpm's which, her mate estimated, lowered her speed one-half knot from 4½ to 4. The tow did not change course. Whatever changes there occurred were in the heading of the Tug. But as to neither of these did the Saconnet's navigators consider that there had been any dereliction by the Lu Ann. To the contrary, in maintaining stoutly the theory of absolute innocence of the Tanker and a self-tripping by the Tug's own conduct, and by categorical uncontradicted testimony of master and pilot, the Saconnet insisted that at all stages the overtaking was safe and was safely executed. In other words, these were not, nor were

they though to be, changes in course or speed of the kind forbidden. Griffin On Collision, § 63 at 176–181. These are the Proctor's natural afterthoughts as he undertakes with resourceful ingenuity the navigation of the cause through the tortuous channels of litigation.

 Moreover, as with any other lookout, the question would exist whether such a lookout would have served any purpose. A ship may be negligent for failure to have a proper, vigilant lookout and yet not be held at fault where, for example, what the lookout would have learned was already known. The Sea Gull, 1875, 23 Wall. 165, at page 176, 90 U.S. 165, at page 176, 23 L.Ed. 90; The Farragut, 1870, 10 Wall. 334, at page 338, 77 U.S. 334, at page 338, 19 L.Ed. 946; The Dexter, 1875, 23 Wall. 69, at page 74, 90 U.S. 69, at page 74, 23 L.Ed. 84; Griffin On Collision, § 114 at 284–287.

Here the Saconnet insists that the Tug should have kept a lookout astern. The question immediately arises, what does the Saconnet contend the Tug would have learned? The question itself is an awkward one for the Saconnet. For the lookout to have been fruitful, the contention must assume that had the Tug's mate looked, he would have seen two things. He would have seen, first, an evident dereliction on the part of the Saconnet either in speed, in position, or both. Second, he would have seen that such violations were so patent and so far advanced that unless the Tug affirmatively took evasive action, serious harm would be done to Tug or tow or both. Of course, that might sometimes be the case, and to extricate herself from the imminent perils of reversal of a half damage decree, the Saconnet is not to be criticized for urging it. But she must do more than contend. She must at least point to facts demonstrating that the Tug on looking would have learned what the Saconnet continues to deny—that she was bent on reckless navigation almost certain to do harm unless the victim took action.

Accepting the facts most favorably to the Saconnet and adopting all of the fact findings made by the District Judge on proper principles of law, there is, in the light of his unchallenged finding of substantial fault against the Saconnet, no basis in law for holding the Tug Lu Ann mutually at fault.

Reversed and remanded.