CHOTIN TRANSPORTATION, INC.

v.

The M/V HUGH C. BLASKE, her engines, tackle, apparel, etc. in rem, and American Commercial Barge Line Company, in personam
(American Commercial Lines, Inc., added party defendant on 5/26/69, by amended Complaint).

AMERICAN COMMERCIAL LINES, INC., et al.

v.

CHOTIN TRANSPORTATION, INC., in personam and the M/V PAT CHOTIN, the M/V JOEY CHOTIN, The STEEL TANK BARGE CHOTIN 2882, CHOTIN 1782, CHOTIN 1310, CHOTIN 2184, CHOTIN 1311, CHOTIN 2185, STCO 208 CHOTIN 2981, and STCO 207, their engines, tackle, apparel, etc., in rem.

BUNGE CORPORATION

v.

CHOTIN TRANSPORTATION, INC. the M/V PAT CHOTIN and the M/V JOEY CHOTIN

v.

AMERICAN COMMERCIAL LINES, Third-Party Defendants.

Civ. A. Nos. 68–1988, 69–50, 69–87.

United States District Court,
E. D. Louisiana.

Sept. 15, 1972.

John W. Sims, John Poitevent, Trial Attys., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Chotin Transportation, Inc., in No. 68–1988.

Robert B. Acomb, Jr., and Donald L. King, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for American Commercial Barge Line Co., in No. 68–1988.

H. Barton Williams, Trial Atty., Deutsch, Kerrigan & Stiles, New Orleans, La., for Tenneco Chemicals, Inc.

Robert B. Acomb, Jr., Trial Atty., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for American Commercial Lines, Inc., and others in No. 69–50.

Phelps, Dunbar, Marks, Claverie & Sims, John Poitevent, New Orleans, La., for Chotin Transportation, Inc., and others in Nos. 69–50, 69–87.

Francis Emmett, Terriberry, Rault, Carroll Yancey & Farrell, New Orleans, La., for Bunge Corp. in No. 69–87.

Robert B. Acomb, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for American Commercial Lines, Inc., third-party defendant.

## MEMORANDUM OF REASONS

COMISKEY, District Judge.

These consolidated cases arise out of a Mississippi River collision between two tows which caused substantial damage to a number of barges and their cargo. Claims have been asserted by the owners, operators and bare-boat charterers of the towboats, their damaged barges and cargo to recover for the damages sustained as a result of this collision. The two tows involved in this casualty are identified hereinafter as the CHOTIN tow, a nine-barge tow consisting of seven steel oil-carrying tank barges owned and/or operated by Chotin Transportation, Inc. and owner pro hac vice of two steel barges, pushed by two towboats, the PAT CHOTIN and the JOEY CHOTIN. The other tow hereinafter referred to as the "ACBL" or "BLASKE" tow consisted of the tow boat HUGH C. BLASKE, made up astern pushing 21 loaded miscellaneous cargo barges owned, operated and controlled by American Commercial Lines, Inc., Commercial Transport Corporation, American Commercial Barge Line Company, Southland Towing Company, Inc. and Inland Tugs Company which corporations appeared as the owners of bare-boat charters of the vessels in the "ACBL" tow and as bailee or assignee of cargo interests on cargo interests on cargo laden aboard nineteen barges. In addition, Bunge Corporation as the owner of the steel barge HD–73B and BUNGE–25 and owner of a cargo of soy beans laden aboard the Barge HD–73B appears in this suit to recover damages to its barge and cargo. Further, Tenneco Chemicals, Inc. has intervened in the original complaint filed by Chotin against ACBL and asserts a claim for damage to and loss of cargo contained in a barge located in the CHOTIN tow.

All parties are seeking to recover their damages in this consolidated action and the owners and operators of the towboats have asserted cross-claims, counter-claims and third-party actions in the various proceedings one against the other seeking to shift responsibility for damages in this matter to the vessel or vessels found at fault. By agreement of counsel, approved by the court, this case was tried on the basis of liability only.

Now, after the trial of the case the Court finds the following facts and enters its opinion.

In the early morning hours of October 25, 1968, the towboat Hugh C. Blaske was proceeding downriver in the Mississippi pushing a tow consisting of 21 loaded barges. At the same time the towboats Pat Chotin and Joey Chotin were proceeding upriver, side by side, pushing a tow of nine loaded barges. Earlier, the Joey Chotin had been sent to assist the Pat Chotin. They had met in the vicinity of Milepost 780. To enable the Joey Chotin to come into position on the starboard side of the tow, the Pat Chotin had released the wires and ratchets used by it to secure itself to its barges and had moved over to the port side of the tow. The evidence is clear that at this time some difficulty was encountered with the wires used to secure the Chotin tow.

Paul Clark, a deckhand on the Pat Chotin testified that while the Pat Chotin and the Joey Chotin were in the process of making up and still proceeding in the river, the Pat Chotin broke the small face wire on its port side. This situation necessitated that the tow either kill off its headway and wait until the proper size wires were spliced to permit it to be used again or to continue the tow using smaller sized wires from one of the barges. This witness further stated that Pilot Palmer, the pilot aboard the Pat Chotin, suggested that they continue to make headway and use

the smaller wires until the broken larger face wires could be spliced.

The Chotin tow did not come to a stop and as it proceeded upriver, the deck-hands on the Pat Chotin tow began to work at splicing the larger steel wires so that they could later be used in securing the tow. It was agreed between the two towboats that the Pat Chotin would provide the navigation and would communicate with other boats on the river and that the Joey Chotin would provide extra power for the tow.

As the upbound Chotin tow approached Milepost 785, it established radio communication with two downbound towboats—one of which was the previously mentioned Hugh Blaske and the other was the M/V Codrington. All three tows agreed by radio to stay on their respective sides of the river and to meet each other and pass starboard to starboard, or, as they say on the river, on the "two-whistle" side.

The night was cool and crisp. The river had a current of approximately two to three knots. Visibility was good and from the pilothouses of the towboats other tows could be observed several miles away. In accordance with its radio understandings with the Codrington tow, which was in back of it, and the Chotin tow, which was in front of it, the Blaske slowed down and allowed the Codrington to pass it. This accomplished, the Codrington then proceeded to meet and safely passed the Chotin tow.

The Blaske tow then navigated to permit the Chotin tow to sail above the narrow stretch of river located around the grain elevator at Osceola in the vicinity of Bullerton Light or at approximately Milepost 784. During this time both vessels sounded a "two-whistle" signal indicating that they confirmed their radio understanding to meet and pass starboard to starboard with each tow staying to its port side of the river. As the distance between the Blaske and Chotin tows closed, it appeared to all three pilots that there would be a safe passage and no one was in any way concerned about the respective courses the vessels were making at the time.

The pilot aboard the Blaske tow, David Shirah, testified extensively in this case, both by deposition prior to trial and as a witness in Court. The Court's opinion is that Pilot Shirah was a most believable and credible witness. Pilot Shirah indicated that for several minutes the Blaske tow had been proceeding downriver at "half ahead" on its engines and that nothing unusual appeared to him as he observed the upbound Chotin tow. However, shortly before the two tows met, he noticed that something happened to the Chotin tow which caused it to proceed at an angle across the river and directly at his tow.

Pilot Shirah testified that when he observed this sudden veer in the course of the Chotin tow, he sounded the danger signal, attempted to steer close to the bank and reversed his engines in an attempt to back up and place his tow out of the way of the Chotin tow.

Unknown to Pilot Shirah, the Chotin tow had encountered difficulty immediately after it had passed the Codrington tow. This difficulty was caused by the breaking of the port face wires on the Pat Chotin. As these wires broke, the stern of the Pat Chotin came into collision with the stern of the Joey Chotin which caused the face wires on the Joey Chotin's port side to break.

Once the wires on the Chotin tow parted, the tow went out of the control of the towboats. Additionally, the current in the river was striking the port side of the Chotin tow and caused the head of the tow to move even further toward the middle of the river. The Chotin lead barge collided with the Barge ACBL 906 of the Blaske tow.

The log of the Pat Chotin, written after the collision, states as follows:

0310—While meeting M/V Hugh C. Blaske at Mile 784 port face wires parted and tow went out of control and head of our tow hit Hugh C. Blaske tow approximately center of

tow, starboard side. Chem barge on head our tow caught fire and other barges from it.

As a result of the collision all of the barges in the Blaske tow with the exception of three were broken apart from the tow and drifted downstream. An explosion and fire occurred with barges bursting into flames. The towboat Blaske was placed in a dangerous situation in the middle of this flaming holocaust. However, Pilot Shirah was able to back his remaining barges out of the tow and brought them to the bank where they were tied off.

The parties to this action have stipulated that a written statement given by Charles S. Blaine, the pilot aboard the Codrington, would constitute his testimony if he were called as a witness in this case and also that his statement together with sketches drawn by him in the presence of attorneys for both Chotin and ACBL could be received in evidence. Captain Blaine was scheduled to testify at the trial but was unable to because of a personal misfortune involving a fire at his home. Captain Blaine was the only independent witness to the events leading up to and immediately following the collision.

In his statement, Captain Blaine relates how the Codrington passed the Blaske tow at about Mile 786 and that the Codrington also met the upbound Chotin tow and passed it at approximately Milepost 784.5. The Codrington, according to his statement, then proceeded downstream.

A sketch drawn by Captain Blaine indicates that the Codrington tow was approximately one-quarter of a mile away from the point of impact between the Chotin tow and the Blaske tow. Captain Blaine's attention was called to the other vessels when he heard danger signals being exchanged. He looked back out of his rear window and also to his radar screen and observed that the Chotin tow was setting out at an angle running from under the island and heading directly at the Blaske tow which was proceeding downriver favoring the red buoy side of the channel. Captain Blaine estimated that the two tows were then at approximately Milepost 785 or at the foot of the "island" and that "it was a matter of a few seconds from the time he heard the first whistle signal and saw them on radar until he saw the explosion which occurred when the barges in the Chotin tow came into contact with the barges in the Blaske tow."

Although there is some variance in the testimony relative to the exact width of the river at the point of the collision, and the parties differ as to the exact milepost where the collision occurred, the Court holds that the river conditions under either version in regard to current and width available for the tows to navigate was not substantially different and under any version there would have been ample room for the tows to safely pass each other under normal conditions.

The Chotin pilots testified that they did not believe there was any forward momentum on the part of their tow at the time of the collision. On the other hand, the pilot of the ACBL tow indicated that at the time of the collision the speed of the Chotin tow was approximately ten miles per hour.

At the trial, Leo Weisgerber, an experienced marine surveyor, produced photographs taken by him of the barge ACBL 906 which photographs depict the damage caused to that barge as the result of the collision. Mr. Weisgerber also testified based on his examination of the barge ACBL 906 and the Chotin barges 2882, 1782 and 1310.

Mr. Weisgerber described the damage caused to the ACBL 906 as extensive and also indicated that the Chotin 2882 and the Chotin 1310, the lead barges in the Chotin tow, sustained hull damage underneath the waterline. According to Mr. Weisgerber, this damage was caused when the bow section of these barges actually rode up and onto the barge ACBL 906. This evidence establishes that the ACBL 906 was struck amidships and convinces the Court that at the time of

the collision, the Chotin tow was still moving forward in the river and after striking the ACBL 906, the lead barges of the Chotin tow rode up onto the ACBL 906 crushing down the ACBL 906's hopper cargo compartment.

■ A charge was made by Chotin interests that the Blaske tow did not have a proper lookout stationed at the time of the collision in violation of Western River Rule 26, 33 U.S.C. § 351. The Court notes that at no time immediately prior to the collision did either the Chotin tow or the Blaske tow have a deckhand or mate stationed to act as a lookout at the head of their tows. There is speculation that a lookout at the bow of the tow or somewhere else on the Blaske could have heard a four-whistle danger signal which Chotin interests claim was sounded five minutes before the collision.

Evidence was introduced by Blaske interests at the trial that the Chotin tow did not sound a danger signal five minutes before the collision, but only very shortly before the tows collided. Also, evidence was introduced that whistle signals could have been heard in the pilot house of the Blaske tow even with its windows and doors closed. All of the witnesses, both Chotin and Blaske, testified unequivocally that it was a clear night and visibility was good for miles on the river. The Court is convinced from the evidence that the best position from which to see and act as a lookout on a large river tow in such circumstances as were here present would be in the pilot house of the tow, which in this case was approximately 42 feet above the water line.

Pilot Shirah, aboard the Blaske, saw the Chotin tow several miles away, observed her lights thereafter, and by reason of his knowledge and familiarity with the channel, as well as his radio understandings with the Chotin tow, discovered and recognized the difficulty that the Chotin tow encountered at the earliest moment which the circumstances permitted. The actions of Pilot Shirah in sounding his danger signals, reversing his engines and attempting to keep his tow out of the way of the oncoming Chotin tow was all that he or anyone else could have done under the circumstances. The Court holds that the Hugh C. Blaske tow and her pilot, David Shirah, took every reasonable means to avoid the collision with the Chotin tow.

The Court finds that the failure to have a lookout on the bow of the Blaske or an independent lookout at any other place on the Blaske was not the proximate or contributing cause of the collision. As early as 1870, the Supreme Court of the United States, in Clark v. The Steamer Admiral Farragut, 10 Wall. 334, 19 L.Ed. 946 (1870), held that the master or owners of a vessel should not be made liable for the consequences of a collision by reason of not having a special lookout where it is found that the collision could not have been guarded against by a lookout, or where it is clear that the absence of a lookout had nothing to do in causing the collision.

It is, undoubtedly, true that the absence of a special lookout would, in many cases, perhaps in most cases, be regarded as evidence of great negligence. The last rule prescribed by Congress by the Act of April 29, 1864 (13 Stat. at L. 61), declares that "nothing in these rules shall exonerate any ship, or the owner, or master, or crew thereof, from the consequences of any neglect to carry lights or signals, of any neglect to keep a proper lookout," etc; thus intimating that a "proper lookout" is one of the ordinary precautions which a careful navigation involves. But it would be against all reason to contend that the master or owners of a vessel should be made liable for the consequences of an accident by reason of not having a special lookout where the collision or loss could not have been guarded against by a lookout, or where it is clear that the absence of a lookout had nothing to do in causing it. * * * A lookout is only one of the many precautions which a prudent navigator ought to provide; but it is not indis-

pensable where, from the circumstances of the case, a lookout could not possibly be of any service. 19 L.Ed. at 947.

In Ellis Towing and Transportation Co. v. Socony Mobil Oil Co., 292 F.2d 91 (5th Cir. 1961), the Fifth Circuit Court of Appeals held that a ship may be negligent for failure to have a proper lookout and yet not be held at fault where what the lookout would have learned was already known. Speaking for the Court, Chief Judge Brown stated:

Moreover, as with any other lookout, the question would exist whether such a lookout would have served any purpose. A ship may be negligent for failure to have a proper, vigilant lookout and yet not be held at fault where, for example, what the lookout would have learned was already known. 292 F.2d at 96.

And recently in the case of China Union Lines v. A. O. Anderson and Company, 364 F.2d 769 (5th Cir. 1966) the court in its opinion stated as follows:

The question of a proper lookout is one of fact to be determined from all of the circumstances on the basis of common prudence, there being no fixed requirement that a vessel maintain a "bow lookout" under the facts and circumstances here presented. The finding of the trial judge on this issue was clearly within the realm of reason. The evidence established without a doubt that the absence of a bow lookout had nothing whatsoever to do with the collision. 364 F.2d at 783.

Having found that the absence of an independent lookout aboard the Blaske had no causal relationship to this accident, the Court dismisses the charge of Chotin interests that the Blaske was in violation of Western River Rule 26, 33 U.S.C. § 351.

■ Chotin interests have also charged that the Blaske is guilty of several other statutory faults. Specifically, Chotin charges that the Blaske violated Western River Rule 18(b), 33 U.S.C. §

343, by sounding a one blast passing signal when the two tows were about one-half mile apart instead of a danger signal and by not hearing or seeing a whistle signal from the Chotin tow; that the Blaske violated Western River Rule 26, 33 U.S.C. § 351, by not maintaining proper radio contact with the Chotin tow; and finally that the Blaske violated Western River Rule 21, 33 U.S.C. § 346, by failing to stop in time the forward motion of its flotilla. These charges of statutory fault on the part of the Blaske likewise fail to help the Chotin claim. While the Court does not agree that the Blaske was guilty of these faults from the facts of this case, even so, there is nothing to convince the Court that these alleged faults could possibly have any real causal connection with the accident. Actually, Chotin's assertion of these statutory faults to bar Blaske's recovery would in effect cause this Court to adopt a rule which is contrary to the decisions in this Circuit, id est, that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination, have had a causal relation to the collision, no matter how speculative, improbable or remote. The Court notes that this same argument has been previously advanced and completely repudiated in the Fifth Circuit. In the Queenston Heights, 220 F.2d 120 (5th Cir. 1955) the Court stated:

We are in accord with the statement of the First Circuit, in Seaboard Tug & Barge v. Rederi, AB/Disa, 213 F.2d 772, that the Supreme Court, in The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable, or remote. 220 F.2d at 122.

■ Pilot Palmer was serving aboard the Pat Chotin for the very first time. All of his previous experience had been

on twin-screw towboats rather than a triple-screw towboat such as the Pat Chotin. He was new in the pilothouse, having boarded the vessel at approximately 7:00 P.M. the previous night as the tow was proceeding through Memphis. He had commenced his first watch aboard the Pat Chotin at 12:00 midnight, only several hours before the collision occurred. As the pilot in charge of the vessel and the tow, it was his responsibility to determine that the tow was properly secured with the proper size face wires, ratchets and long wires.

 The evidence indicates that prior to the collision the Chotin tow was navigated too close to the bank causing it to go aground which caused the breaking of the port face wires and the commencement of the events leading to the collision. The breaking of the face wires between the two Chotin towboats and their tow was the reason the Chotin tow went out of control prior to the collision and therefore was the principal cause of the disaster. The Court finds that the wires used by the Chotin towboats to make up to their tows were not the normal standard size wires generally used, but were barge wires of a smaller size which wire made the Chotin tow unseaworthy. This unseaworthiness caused the Chotin tow to disintegrate and to suddenly, without warning, veer into the path of the downward bound Blaske tow, at a time too late for the Blaske to do anything to avoid the collision. Causing this series of events to occur constituted gross negligence on the part of the Chotin tow.

Where the gross negligence of one vessel is wholly sufficient in itself to account for the collision, and where the active fault of one vessel so flagrantly and heavily outweighs any possibile fault or omission of the other vessel, the interests of justice are best served by condemning the more culpable vessel completely. Compania de Maderas v. The Queenston Heights, 220 F.2d 120 (5th Cir.); The Great Republic, 23 Wall., 90 U.S. 20, 23 L.Ed. 55; The Lord O'Neal, 4th Cir., 66 F. 77.

In conclusion, the Court finds that the sole and proximate cause of this collision was the unseaworthiness of the Chotin tow and the negligence of the pilots aboard the two Chotin towboats, Pat Chotin and Joey Chotin. Further, the Court finds that there was no unseaworthiness or negligence on the part of the ACBL tow or the towboat Hugh C. Blaske.