574 F.2d 289
 BOARD OF COMMISSIONERS OF the PORT OF NEW ORLEANS, Plaintiff-Appellee,
v.
M/V FARMSUM, her engines, etc., in rem, and N. V. Stoomvaart
Maatschaapij "Oostzee", in personam, Defendants-Appellees,
v.
TUG O. H. INGRAM, her engines, etc. in rem, and Ingram Barge
Company, a division of Ingram Corporation, in
personam, Third-Party Defendants-Appellants.
 No. 75-3008.
 United States Court of Appeals,
Fifth Circuit.
 June 5, 1978.
 
 Nigel E. Rafferty, John Blackwell, New Orleans, La., for third-party defendants-appellants.
 Ronald A. Johnson, New Orleans, La., for Bd. of Com'rs of Port of New Orleans.
 M. D. Yager, New Orleans, La., for M/V FARMSUM, etc.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before BROWN, Chief Judge, AINSWORTH, Circuit Judge, and JAMESON*, District Judge.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 On the night of July 20, 1973, at 10:50 p. m., M/V FARMSUM, on a course up the Mississippi River, collided with the Governor Nicholls Street Wharf in the Port of New Orleans and caused $35,000 in damages to the wharf. The owner of the wharf, the Board of Commissioners, brought suit in rem against M/V FARMSUM and in personam against the vessel's owner and operator, N. V. Stoomvaart-Maatschaapij "Oostzee."[1] The owners of M/V FARMSUM filed a third-party complaint against the Ingram Barge Company, owner and operator of the tug M/V O. H. INGRAM, alleging that INGRAM had so embarrassed M/V FARMSUM's navigation as to cause the collision.[2] Although the District Court found M/V FARMSUM guilty of numerous faults, it also found that INGRAM had contributed to the collision through a single act of negligence. The Court ordered the damages divided equally between the vessels. On appeal, INGRAM contends that the District Court erred in finding fault on INGRAM's part or, alternatively, in failing to divide the damages according to the comparative degree of fault of the two vessels. Agreeing with appellant that the collision was due to the sole fault of M/V FARMSUM, we reverse the District Court without reaching any measurement of comparative fault under United States v. Reliable Transfer Co., 1975, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251, 1975 A.M.C. 541. With this falls not only M/V FARMSUM's natural and legitimate effort to sustain its divided damage victory, but the sometime tongue-in-cheek supplication that we overturn the finding of any fault against M/V FARMSUM or, on the bakery theory of half a loaf is better than none, increase beyond 50% The fault of INGRAM.
 
 
 2
 This admiralty case comes to us after trial on the issue of liability to the District Court without a jury. Several months after the conclusion of the trial the District Court entered a lengthy and detailed unpublished opinion which served as the Court's findings of fact and conclusions of law. Except for minor editorial changes, our recital of the facts comes from that opinion.
 
 The Collision
 
 3
 On the evening of July 20, 1973, M/V FARMSUM, a diesel propelled, single screw bulk carrier 680 feet long and 90 feet of beam of Dutch registry, was proceeding upriver on the Mississippi on a voyage from Surinam to Burnside, Louisiana. She carried a cargo of bauxite and had a mean draft of 24 feet. Captain Eldert Dobbenga commanded M/V FARMSUM and the chief officer was Cornelius Guijt. Both men were experienced seamen and held masters licenses.
 
 
 4
 The tug O. H. INGRAM was proceeding downriver on the Mississippi to the Murphy Oil facility near Meraux, Louisiana. The twin screw, 5,000 horsepower tug measured 144 feet by 40 feet with a 9 foot draft, and pushed four empty gasoline barges which had not been gas-freed. Three barges were lined up directly in front of the tug. Those barges, from bow to stern, were STC 2016 (240 feet in length), Red Wing (142.4 feet and Vicksburg (155 feet). The fourth barge, Tampa (145 feet), was made up along the port side of STC 2016, the lead barge. The entire tow measured 681.4 feet in length. There was a red light on the bow of Tampa and a green light on the forward starboard corner of STC 2016. The tug and tow carried a crew of 11 persons, including 7 deckhands, a cook, 2 engineers and the pilot. The pilot, Captain Oliver Altman, held an operator's license from the Coast Guard for uninspected vessels, Western Rivers and Inland Waters, and had worked on tugboats since 1966. The engineer was Louis E. McGrew and the first mate was Edward Tapp.
 
 
 5
 The collision with the wharf occurred on the Mississippi at New Orleans where the river, viewed from upstream, makes a right turn at about a 90o angle. The left descending bank[3] forms the bend. The Governor Nicholls Street Wharf is located in the bend on the left descending bank opposite Algiers Point on the right descending bank. The collision occurred on a clear night. Visibility was good and there was no appreciable wind.
 
 
 6
 As INGRAM approached Algiers Point, Captain Altman monitored channels 13 and 16 on his radio for maritime traffic. Broadcasting on these frequencies, he checked three times for upbound traffic in the vicinity, once one-quarter mile above the Greater New Orleans Mississippi River Bridge (about one and one-quarter miles above Algiers Point), once one-quarter mile below the bridge (about three-quarters of a mile above the point), and once one-quarter mile above the Point. Altman received no response. Lewis McGrew, engineer on the INGRAM, was in the pilot house with Altman and could hear Altman's calls. He was in a position to hear any responses and he testified there were none.
 
 
 7
 The tug and tow traveled at approximately 12 miles per hour over the ground and was located near the center of the river as it passed under the bridge. One-quarter mile from the Point, Captain Altman sounded what he said was a bend signal, which he described as one distinct blast of two to three seconds. Having received no response to his radio calls for upbound traffic below the Point, and no response to the whistle signal, he assumed there was no traffic. Accordingly, he prepared to navigate around the Point by slowing to 6-8 miles per hour and steering toward the right descending bank. Altman testified that he did not post a lookout.
 
 
 8
 Meanwhile, M/V FARMSUM was also approaching Algiers Point from downriver.
 
 
 9
 At the U.S. Quarantine Station, about two and one-half miles downstream from Algiers Point, M/V FARMSUM stopped its engines and exchanged pilots. Roy L. Nance, a member of the New Orleans-Baton Rouge Steamship Pilots Association, came on board about 10:30 p. m. Nance held a Coast Guard first class pilot's license since 1963 and a master's license for five years at the time of trial.
 
 
 10
 When Nance boarded M/V FARMSUM, he ordered the engines full ahead. As M/V FARMSUM approached Algiers Point, Nance ordered the engines reduced to half-speed. Several minutes after M/V FARMSUM's speed had been reduced, Nance sighted the INGRAM's lead barge emerging from around the Point, close to the right descending bank, and showing its green light. At this time M/V FARMSUM was upbound in the center of the river.
 
 
 11
 Shortly after the sighting, the vessels established radio contact and agreed to pass port to port.[4] All witnesses were in agreement, and the District Court found, that at the time of the sighting a port to port passing could be safely made.
 
 
 12
 After Altman agreed to pass port to port, he cut his starboard engine, went full ahead on his port engine and turned his rudder hard to starboard.[5] The tug's speed was increased to 10 miles per hour and the current caused the tug and tow to slide to port about 100 feet.
 
 
 13
 Nance testified that he steered to starboard to bring M/V FARMSUM into the bend. However, neither Guijt nor Dobbenga, who were in the pilot house with Nance, mentioned him doing so. Nance also testified that as the tug was steering around the Point, it "fell off the Point" into the bend in a sideward fashion and was off M/V FARMSUM's port bow coming toward her course line. Guijt testified that the tow continued to show only her green light. McGrew testified that the tow was never more than 500 feet from the right descending bank. (The river is approximately 1,600 feet wide at the Point opposite the Governor Nicholls Street Wharf.) The District Court found that the INGRAM was never past the center of the river as she navigated the Point, and that the INGRAM took all necessary steps to perform the port to port passing agreement.
 
 
 14
 According to Altman, when the vessels were approximately 2,000 feet apart Nance contacted Altman by radio and told him he didn't think a port to port passing was possible, and the vessels should pass starboard to starboard. At that time INGRAM was not past the center of the river, but was closer to the right descending bank. Altman replied "I'll try, but I don't think I can make it." Altman then went full ahead on his starboard engine, stopped his port engine and put his rudder hard to port.
 
 
 15
 Altman maintained that the vessels could have passed port to port. He also believed they could also have passed starboard to starboard if M/V FARMSUM had immediately steered to the Point. McGrew testified that if the vessels were able to make a starboard to starboard passing, it would be close. On board M/V FARMSUM, however, Guijt and Dobbenga both considered a starboard to starboard passing dangerous.
 
 
 16
 Meanwhile, about one or two minutes after the starboard to starboard passing had been proposed by M/V FARMSUM and reluctantly accepted by INGRAM, Nance ordered M/V FARMSUM's rudder hard to port. The ship's engine was still on half ahead and the vessels were 1,000 feet apart, according to Guijt, while Nance at various times in his testimony fixed the distance at three-quarters of a mile and one-quarter of a mile. M/V FARMSUM was in the center of the river and after the hard left rudder order was given, it swung 10o to port, according to Nance.
 
 
 17
 Without advising Nance, Captain Dobbenga ordered the quartermaster to put the rudder midships, and then hard to starboard, apparently intending to revert to the port to port passing agreement. When Nance noticed that the vessel had stopped swinging to port, he confronted Dobbenga and asked him if he was taking over control of the vessel. Nance claims the captain told him "no", and ordered the quartermaster to put the rudder back to port.
 
 
 18
 The effect of these conflicting orders was that M/V FARMSUM continued to proceed up the middle of the river, without appreciably changing course.
 
 
 19
 When McGrew, the engineer on INGRAM observed that M/V FARMSUM had not changed course and that the tow was beginning to cut across the bow of M/V FARMSUM, he became nervous and ran below to the engine room. Without being ordered to do so, he turned the engine overload device switch, which increased the engine speed of each engine by 30 RPMs. Altman threw his engines in reverse and blew a danger signal. According to Altman, the vessels were then 500 feet apart. Although not challenged by M/V FARMSUM, we think it best here to quote the Trial Judge's own words with respect to that moment: "Using the additional power provided by the overload device, within five seconds the tug began moving backward through the water at 5 to 6 miles per hour."
 
 
 20
 Nance also became convinced that a collision was near. Either he or Captain Dobbenga ordered the engines full astern. At that time, according to Guijt, both the red and green lights of the tow were visible. After INGRAM blew a danger signal, Nance also blew one and radioed INGRAM. He told Altman, "Back her full, O. H.!", obviously referring to O. H. INGRAM. At that time Altman already had his engines in reverse and was on overload, and the tug and tow were moving back in the water.
 
 
 21
 Nance asked Altman what the barges contained. When Nance was told it was gasoline, Altman observed the bow of M/V FARMSUM swing sharply to starboard.
 
 
 22
 The tug and tow continued to move backward in the water with the head of the tow swinging slightly to starboard because of the reverse engines and the action and position of the four backing rudders which were turned hard to starboard. The vessels missed each other by about five feet according to Altman, and by less than 100 feet according to Tapp.
 
 
 23
 M/V FARMSUM continued to make headway while its engines were reversed. Between three and five minutes after the engines were ordered astern, the vessel collided with the Governor Nicholls Street Wharf.
 
 
 24
 Captain Dobbenga testified that he suggested to Nance after they had just narrowly averted a collision with INGRAM that they drop anchor to stop the vessel. Nance rejected the suggestion. Chief Officer Guijt stated that he asked Nance why he had not dropped anchor and that Nance told him it was because there were cables in the area. A notation to this effect appears in the ship's log.
 
 
 25
 However, at trial Nance denied that he had ever told anyone that he couldn't drop anchor because of cables. In fact, he said the cables were considerably downstream from the bend. He claimed he did not drop anchor because he feared a possible explosion if he hit the gasoline barges. He also said that had he dropped the anchor after he was clear of the barges, he would have been too close to the wharf to avoid a collision.
 
 The Findings Of Fault
 
 26
 The District Court found that M/V FARMSUM was clearly at fault. The Court determined that: "(w)hen a moving vessel collides with a fixed object, there is a presumption that the moving vessel is at fault. The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943, 949 (1895); Petition of United States, 425 F.2d 991 (5 Cir., 1970); Brown and Root Marine Operators, Inc. v. Zapata Offshore Co., 377 F.2d 724 (5 Cir., 1967). The presumption suffices to make out a prima facie case of negligence against the moving vessel. The Victor, 153 F.2d 200, 201 (5 Cir., 1946)."
 
 
 27
 The District Court made several specific fault findings. First, "(t)he FARMSUM was at fault for failing to shape up to execute any of the passing agreements it alleges were made between the vessels. By Nance's own testimony, the FARMSUM was still located in the middle of the river for several minutes after the starboard to starboard agreement had been reached immediately before the near collision between the vessels. Nance claimed this was the third agreement which had been reached (first, starboard to starboard, then port to port, and then starboard to starboard). Yet the FARMSUM did not move out of the middle of the river. Even after the pilot ordered rudder hard to port, the Captain's countermand of his order resulted in the vessel's remaining in the middle of the river, making any type of passing just about impossible without great risk of collision."
 
 
 28
 Second, "(t)he FARMSUM was also at fault for failing to blow a danger signal and reverse its engines at the time the pilot had doubts as to whether a port to port passing could be made. Both Dobbenga and Guijt characterized the pilot's change to a starboard to starboard passing as a dangerous decision. . . . Dobbenga told Nance he wouldn't be able to pass starboard to starboard. Altman also expressed doubt about the success of the proposed starboard to starboard passing. Under such circumstances, Nance should have backed off. Inland Rules of the Road, Article 18, Rule III, 33 U.S.C. 203."
 
 
 29
 "Finally, the FARMSUM was at fault for failing to slacken her speed or reverse her engines when the danger of collision was or should have been apparent. Inland Rules of the Road, Article 23, 33 U.S.C. 208. . . . (H)ad the FARMSUM backed her engines a minute earlier, a collision with the wharf would likely have been avoided. During the time when a decision to reverse the engines of the FARMSUM should have been made, her master and her pilot were arguing about navigation and were giving conflicting orders. Whether an error of judgment by the master or the pilot contributed to the collision, the vessel is nevertheless liable. The China, 74 U.S. (7 Wall.) 53, 19 L.Ed. 67 (1869); Afran Transport Company v. S/S Transcolorado, 468 F.2d 772 (5 Cir., 1972)."
 
 
 30
 FARMSUM claimed at trial and repeats on appeal that prior to the time the vessels came in sight of each other INGRAM was guilty of several faults: failure to observe the custom on the lower Mississippi that upbound vessels come up under the points and downbound vessels run the bends; failure to sound a bend signal of the required duration at the required distance from the bend; and failure to keep a proper lookout.
 
 
 31
 The District Court thoroughly discussed the first FARMSUM claim that "(o)n the lower Mississippi River, 'the judicially recognized custom is that the upbound vessels come up under the points and the downbound vessels run the bends (citations omitted). This is a rule of prudence dictated by the fact that the current in the Mississippi runs downstream into the bends, leaving slack water under their points.' Koch-Ellis Marine Contractors, Inc. v. Capetan Dimitris, 176 F.Supp. 645, 646 (E.D.La.1959), aff'd 302 F.2d 462 (5 Cir., 1962). See also The Norne, 59 F.2d 145 (5 Cir., 1932); The Steven R. Jones, 27 F.2d 208 (5 Cir., 1928); Managua Nav. Co. v. Aktielselskabet Borgestad, 7 F.2d 990 (5 Cir., 1925); Shirley v. The Richmond, 21 Fed.Cas.No. 12,795 (Cir.Ct.D.La.1874); Schware v. M/V Birney R, 198 F.Supp. 515 (E.D.La.1961)."
 
 
 32
 The District Court noted that "(i)f the point-bend custom had been observed in this case, the INGRAM as the downbound vessel would have navigated the bend, near the left descending bank, then the FARMSUM would have navigated the point, near the right descending bank.
 
 
 33
 "Altman admitted that on the date of the collision, he was not familiar with the custom. Since the time he learned of it, he has navigated from Cairo, Illinois to Head of Passes, and testified that the custom is not always observed.
 
 
 34
 "Nance likewise testified that the point-bend custom was not a hard and fast rule. He stated that tugs with tows sometimes give upbound vessels the bend and the downbound vessel usually is given the choice of the passing agreement.
 
 
 35
 "It should be noted that at the time the FARMSUM sighted the head of the INGRAM's tow, the FARMSUM had not shaped up to reserve the point-bend custom. The vessel was in the center of the river and had not steered toward the right descending bank in order to come up under the Point, as the upbound vessel would have been required to do under the point-bend custom."
 
 
 36
 Under these circumstances, and considering the fact that both vessels agreed to pass in contravention of the point-bend custom after they were in sight of each other, the District Court concluded that INGRAM was not at fault for failing to observe the point-bend custom.
 
 
 37
 Similarly, the District Court found that INGRAM was not at fault in failing to sound a proper bend signal. The Court emphasized that Nance had claimed that the two vessels were in radio contact prior to his sighting of the lead barge at the Point. If that were true, the District Judge reasoned that the alleged failure of INGRAM to sound a proper bend signal could not have caused the collision.
 
 
 38
 Finally, M/V FARMSUM claimed that INGRAM's failure to station a lookout at the head of the tow contributed to the collision. The District Court pointed out that "when the green lights of the INGRAM's barge became visible as it moved around and from behind the Point, it was seen immediately by Nance and Guijt on the FARMSUM. Nance then contacted Altman by walkie-talkie. Thus a lookout on the INGRAM's lead barge could not have alerted Altman to the presence of the FARMSUM appreciably sooner than actually occurred."
 
 
 39
 As further support for its rulings on these three claims of fault, the District Court also determined that any fault or negligence on the part of either vessel prior to the time they came in sight of each other was irrelevant. The Court reasoned that because all evidence indicated, and all of the actors agreed, that the port to port passage could be safely made at the time that agreement was reached, any faults prior to the sighting and the subsequent port to port passing agreement did not cause or contribute to the collision.
 
 
 40
 Additionally, M/V FARMSUM contended that INGRAM was at fault in agreeing to attempt a starboard to starboard passing when Altman expressed reservation about the passing. Consequently, M/V FARMSUM claimed that this failure by the INGRAM embarrassed the FARMSUM's navigation and caused its collision with the wharf. The District Court stated that M/V FARMSUM would be entitled to some recovery against the INGRAM if this allegation were proved.
 
 
 41
 The District Court then concluded that INGRAM was at fault for attempting the starboard to starboard meeting. The Court reasoned that Altman's response to the proposed crossing, "I'll try, but I don't think I can make it," indicated that he had serious doubts about whether the proposed crossing could be made safely. According to the District Judge, "Altman should have refused to agree to the proposal and should have, at least, insisted on the port to port passing. If Nance had then agreed to pass port to port, in all likelihood this collision would have been averted. If Nance had refused to agree, then both vessels should have reversed their engines. See 33 U.S.C. §§ 203, 208. Eastern Steamship Co. v. International Harvester of New Jersey, 189 F.2d 472 (6 Cir. 1951); James McWilliams Blue Line v. Card Towing Line, 168 F.2d 720 (2 Cir. 1948)."
 
 
 42
 The District Court found both vessels at fault, and that the fault of each was sufficient to cause the collision. The Court divided the damages equally citing Weyerhaeuser Steamship Co. v. United States, 1963, 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1, 1963 A.M.C. 846. In a postjudgment motion, INGRAM urged the Court to apportion damages according to the comparative degree of fault of the two vessels pursuant to the then intervening Supreme Court decision in United States v. Reliable Transfer Co., 1975, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251, 1975 A.M.C. 541. The District Court denied the motion and retained equal division of the damages.
 
 The Good And Faulty Findings
 
 43
 The District Court's detailed discussion and the reasons for its conclusions, which we have cited at length, convinces us that the Trial Court was clearly right in its findings of fault with respect to M/V FARMSUM and the exoneration of INGRAM, except for one. We reject the District Court's finding fault with INGRAM for agreeing to the starboard to starboard passing.
 
 
 44
 The District Court found INGRAM at fault for agreeing to pass starboard to starboard when Captain Altman had reservations about such a passing. To support its finding the Court cited 33 U.S.C. §§ 203 and 208, and two cases, Eastern Steamship Co. v. International Harvester of New Jersey, 6 Cir., 1951, 189 F.2d 472; James McWilliams Blue Line v. Card Towing Line, 2 Cir., 1948, 168 F.2d 720 (see page 721). With nothing more than a "see" the District Judge referred to Section 203. Presumably by the cases cited he intended to refer to Rule III of Article 18 which states that "(i)f, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, for any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."[6]
 
 
 45
 INGRAM at no time failed to understand M/V FARMSUM's course or intention. At the time the starboard to starboard passing agreement was made there existed no disagreement between Altman and Nance as to the course of action required by the agreement. Altman simply expressed his reservations about the change in the earlier port to port passing and nothing more. His testimony demonstrated that he felt the passing could be safely made as long as M/V FARMSUM did her part immediately. A verbal (or whistle signal) rejection of M/V FARMSUM's proposal would not have told M/V FARMSUM of anything she did not then know, and with the vessels moving closer and closer into the jaws of collision INGRAM was entitled to accept the proposal with the clearly implied warning to M/V FARMSUM that a safe passage was predicated on M/V FARMSUM swiftly acting to carry out the agreement. When M/V FARMSUM did not perform the required course change, INGRAM immediately reversed engines and sounded the danger signal.
 
 
 46
 Of course, a vessel is entitled to rely on the announced intention of another vessel with regard to a passing, and on the presumption that the other vessel will govern herself accordingly. In re M/V Fay Blackman, 5 Cir., 1971,437 F.2d 542, ---A.M.C. ---; Slade Inc. v. Mississippi Valley Barge Co., 5 Cir., 1961, 296 F.2d 188, 191, 1961 A.M.C. 2559; National Steel Corp. v. Kinsman Marine Transit Co., E.D.Mich.1972, 369 F.Supp. 498, 509, 1974 A.M.C. 1070, aff'd sub nom., National Steel Corp. v. Buckeye S. S. Co. & Biddy Line, Ltd., 6 Cir., 1974, 492 F.2d 364.
 
 
 47
 M/V FARMSUM proposed the passing and, at the time, both Nance and Altman considered the vessels able to make the passing. Having proposed the agreed arrangement at the time, M/V FARMSUM cannot now, with the benefit of hindsight, claim that the tug had to reject the proposal, especially when it was she who proposed a change in the already agreed passing. Add to this the fact that collision became imminent, not because INGRAM's master expressed apprehension, but because M/V FARMSUM failed to carry out the new proposal because of the fault which can seldom, if ever, be excused confusion on the bridge, conflict between master and pilot, and uncommunicated contradictory orders to the helmsman and the engine room.
 
 
 48
 All else now failing, all M/V FARMSUM can do is fall back on the convenient and often harsh rule of The Pennsylvania, 1874, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148. But this is no anchor to windward. The Pennsylvania established a sometimes awesome rule of causation in maritime collision upon the showing of any statutory violation. We have held, however, that the methods of rebutting the rule are not few or tightly circumscribed.
 
 
 49
 "The Pennsylvania * * * did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable, or remote."
 
 
 50
 Compania De Maderas De Caibarien v. The Queenston Heights, 5 Cir., 1955, 220 F.2d 120, 122, 1955 A.M.C. 797, cert. denied sub nom. Esso Shipping Co. v. Compania De Maderas De Caibarien, 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736, 1955 A.M.C. 2137. See China Union Lines, Ltd. v. A. O. Anderson & Co., 5 Cir., 1966, 364 F.2d 769, 781-83, 1966 A.M.C. 1653, cert. denied, 1967, 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805, 1967 A.M.C. 2531. See generally Bue, Admiralty Law in the Fifth Circuit A Compendium For Practitioners: II, 5 Houston L.Rev. 767, 798-807 (1968).
 
 
 51
 As this Circuit's progeny of The Pennsylvania reveals, fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract. E. g., Chotin Transportation, Inc. v. M/V Hugh Co. Blaske, E.D.La., 1972, 356 F.Supp. 388, 394, aff'd, 5 Cir., 1973,475 F.2d 1370, 1973 A.M.C. 2690 (absence of lookout not contributory cause of collision); Atkins v. Lorentzen, 5 Cir., 1964, 328 F.2d 66, 71, 1964 A.M.C. 2331 (no bow lookout and failure to effect engine maneuvers not contributory cause of collision). See G. Gilmore & C. Black, The Law of Admiralty at 494 (2d ed. 1975); J. Griffin, The American Law of Collision, §§ 213, 214 (1949). Substantial and uncontradicted evidence convinces us that any supposed faults of INGRAM could not possibly have any real causal connection with the collision.
 
 
 52
 Accordingly, having reviewed the record, we have "a definite and firm conviction that a mistake has been committed" by the District Court, and its finding of contributory fault on INGRAM's part must be overturned as clearly below the Plimsoll line of F.R.Civ.P. 52(a). Union Oil Co. of California v. M/V Issaquena, 5 Cir., 1973, 470 F.2d 875, 877, 1973 A.M.C. 493; D/S Ove Skou v. Hebert, 5 Cir., 1966, 365 F.2d 341, 346, 1966 A.M.C. 2223.
 
 
 53
 Consequently, all fault rests with M/V FARMSUM which is solely liable for the damages incurred, and there is no place for the application of Reliable Transfer, supra. Cliff, Jr. Inc. v. M. V. Captain Will, 5 Cir., 1976, 529 F.2d 1169, 1976 A.M.C. 48.
 
 
 54
 AFFIRMED IN PART; REVERSED IN PART.
 
 
 
 *
 Senior District Judge from the State of Montana, sitting by designation
 
 
 [1]
 M/V FARMSUM will refer to either the vessel or its owner
 
 
 [2]
 INGRAM will refer to either the tug or its owner
 
 
 [3]
 While accurate to furnish a clear verbal picture, this descriptive may offend purists who speak always of the left bank ascending which produces the geographical curiosity of looking eastward to see the west bank
 
 
 [4]
 In the trial below there was substantial conflict over whether the vessels had been in earlier contact. When Nance boarded M/V FARMSUM, he carried a VHF walkie-talkie radio, which picked up channels 6, 12, 13 and 16. He testified that he could not remember whether the ship's radio was on. However, Captain Dobbenga and chief officer Guijt, who were on the bridge, testified that the ship's radio was off. Nance claimed he broadcast his position using the walkie-talkie, and that he had contacted a southbound tug near Algiers Point and had agreed to pass starboard to starboard
 The District Court found that no agreement existed prior to the time of sighting. Although Nance testified there was such an agreement, Altman denied there was one. Altman's testimony was corroborated by McGrew. Also, Dobbenga and Guijt could not corroborate Nance's testimony, since they could not hear what Nance said when he broadcast over the walkie-talkie or any reply he may have received. The District Court's finding is clearly supported and is not challenged on appeal.
 
 
 [5]
 We have adhered to the Trial Judge's language throughout our decision, including his frequent reference to his descriptive of helm orders "hard a starboard" "hard a port" even though if given they are a violation of the 1935 additions to Art. 32 which provide:
 All orders to helmsmen shall be given as follows: "Right Rudder" to mean "Direct the vessel's head to starboard." "Left Rudder" to mean "Direct the vessel's head to port."
 33 U.S.C. § 232.
 Whether forbidden language was used on either bridge is unknown, but none suggest that this verbal dereliction is of any legal consequence.
 
 
 [6]
 Rule III of Article 18 of the Inland Rules of the Road, now 33 U.S.C.A. § 203
 The District Judge's citation to § 208 (Article 23 of the Inland Rules of the Road) is difficult to fathom. It dictates that "every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse." Neither vessel was commanded by the rules to keep out of the way of the other.