ST. PHILIP OFFSHORE TOWING
COMPANY, INC.

v.

WISCONSIN BARGE LINES, INC., in personam, and the M/V JIM BERN-HARDT, her engines, tackle, apparel, furniture, etc., in rem.

Civ. A. Nos. 77–1541, 77–2050, 77–2051, 78–1579 and 77–2660.

United States District Court,
E. D. Louisiana,
New Orleans Division.

March 7, 1979.

---

James M. Tompkins, McGlinchey, Stafford, Mintz & Hoffman, New Orleans, La., for plaintiff.

W. J. Larzelere, Jr., Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

COLLINS, District Judge.

This case arises out of a maritime collision which occurred on May 16, 1977 in the area between Miles 144 and 143 of the Lower Mississippi River. The collision involved two vessels and their respective tows: The M/V JIM BERNHARDT, owned by Wisconsin Barge Lines, Inc. and The Tug ANTHONY P. ST. PHILIP, owned by St. Philip Offshore Towing Company, Inc. The owners of the barges in tow of The M/V JIM BERNHARDT have brought var-

ious claims for hull and cargo losses. St. Philip Offshore Towing Company, Inc. has brought a claim for damage to its tow, the Barge PIERCE, which was owned by Agrico Shipping Company and under bareboat charter to St. Philip Offshore Towing Company, Inc.

The trial was before the Court without a jury on the issue of liability only with the issue of damages reserved for a later trial. After having heard the evidence and considering the briefs and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. At all material times, Agrico Shipping Company was the owner of the seagoing tug and tow, ANTHONY P. ST. PHILIP and Barge PIERCE, both of which vessels were under bareboat charter to, and operated by, St. Philip Offshore Towing Company, Inc.

2. The tug ANTHONY P. ST. PHILIP [hereinafter ST. PHILIP], measuring approximately 145 ft. × 35 ft. × 18 ft. and generating approximately 5700 to 6000 horsepower from her twin engines, was equipped with a "model" or V-shaped bow which fit into the notch at the stern of the Barge PIERCE during push-towing of the latter vessel. The Barge PIERCE measured approximately 495 ft. long by 89 ft. wide and, on the date of the incident in suit, was loaded with approximately 27,000 tons of phosphate rock so that her fresh water draft was approximately 32 ft. at her bow and 33 ft. at her stern. The overall length of the ST. PHILIP's flotilla was approximately 644 ft. The tug's navigation is controlled from the wheelhouse. However, due to the varying heights of the barges which are towed, the ST. PHILIP has two wheelhouses. The upper wheelhouse is positioned on a mast estimated to be 40–50 feet above the surface of the river. Both wheelhouses contain various navigational aids, including VHF radio sets, radar and a gyro compass.

3. Wisconsin Barge Line, Inc. was, at all material times, the owner of The M/V JIM BERNHARDT [hereinafter JIM BERN-

HARDT], a triple-screw, 10,500 horsepower pushboat, measuring 195 ft. × 54 ft. × 10.6 ft. At the time of the incident in suit, she was pushing ahead 29 loaded barges made up six wide by five long with a "notch" or empty space at the starboard stern of the tow. Each barge was 195 ft. long by 35 ft. wide, so that the total length and width of the JIM BERNHARDT's flotilla was approximately 1170 feet by 210 feet. The tug's wheelhouse, which provides the navigator with an eye level 40–50 feet above the River surface, is equipped with various navigational aids, including two radar sets and two VHF radios.

4. Other plaintiffs in this case, Mid America Transportation Company, Continental Marine Corporation, Zito Barge Line, Inc., and ContiCarriers & Terminals, Inc., were owners of those barges in JIM BERNHARDT's tow which the parties have stipulated were damaged as a result of the collision hereinafter described. These plaintiffs suffered both hull and cargo damage.

5. A specific location on the Mississippi River can be described by two distinct methods. The first method utilizes the distance from the foot of Canal Street in New Orleans to the specified location on the River. Using this method in the present case, the collision occurred between 48-Mile Point and 50-Mile Point or at a place on the River between 48 and 50 miles from Canal Street. Because there is a bend in the River at each of these points, the bends have become known as 48-Mile Point and 50-Mile Point. The Court hereinafter will use these two terms to identify the bends in the River between which the collision occurred.

The second method utilizes the number of miles that a location is from the mouth of the Mississippi River. Using this method, the Court can more precisely indicate the location between 48-Mile Point and 50-Mile Point where the collision occurred. Thus, the collision occurred in the area of the River between Miles 144 and 143 or approximately 143 to 144 miles from the mouth of the River.

6. When the downbound JIM BERNHARDT was above Mile 145, the ST. PHILIP was upbound below Mile 142. At this time, the navigators of the two vessels were in radio communication with each other and agreed to meet and pass each other port-to-port. The Master of the ST. PHILIP, Captain Houston, asked for such a passing in order to keep its heavily loaded barge in the deepest part of the channel which, in this area, favors the east bank of the River between Miles 145–142. On other occasions Captain Jones, the Master of the JIM BERNHARDT, had passed vessels port-to-port in this reach of the River and therefore agreed to the proposal. The passing agreement was never changed before the collision.

7. Captain Houston, Master of the ST. PHILIP, is a licensed, experienced ocean operator and has often navigated this area of the Mississippi River. He testified that he made the right hand bend at 48-Mile Point as he always did, "hugging the point and the east bank shore." At all times during his navigation from Belle Point Light (approximately Mile 142.5) until he reached an area just below the revetment at Marquez Light (approximately Mile 143.-4) he kept his tug and barge 40 to 100 feet off the east bank. He followed a compass heading of 316° or 318°.

8. Captain Jones, navigator of the JIM BERNHARDT, has held a first class pilot's license for unlimited size vessels on the Mississippi River since 1970. He had been piloting river towboats in this reach of the River since 1963. His experience includes considerable time navigating large towboats and tows and he has been captain of the JIM BERNHARDT since June, 1976. While the ST. PHILIP was proceeding around 48-Mile Point, the JIM BERNHARDT was preparing to make the right hand bend at 50-Mile Point. The JIM BERNHARDT had also arranged to pass an upbound towboat, the M/V DAN C. BURNETT [hereinafter BURNETT], on a starboard-to-starboard passing. The BURNETT was at this time proceeding upriver favoring the west bank below the bend at 50-Mile Point.

9. Dan Burnett, Captain of the BURNETT, was also an experienced river navigator. His vessel was pushing 15 barges, three wide and five long. The tug BURNETT was 162 ft. long and 45 ft. wide giving the entire flotilla a length of approximately 1100 ft.

10. Fifty-Mile Point forms an approximately 90° right hand bend for downbound vessels, while 48-Mile Point forms an approximately 90° right hand bend for upbound vessels. The river is approximately 2500 ft. wide at 50-Mile Point, and gradually narrows to approximately 2000 ft. at Mile 143.4, below which it generally widens again to approximately 2500 ft. at 48-Mile Point. Along the right-descending (west) side of the River between 50-Mile Point and 48-Mile Point, there were three barge-fleeting areas which extended approximately 400 ft. to 500 ft. out into the River from the west bank. Several fleets of barges were moored in this area. The water along the right-ascending (east) side of the River at that location is generally much deeper than it was along the opposite side of the River. During at least the 20–30 minutes or so preceding and including the incident, there was a 35 ft. to 50 ft. high fog bank enshrouding the river from approximately 50-Mile Point to 48-Mile Point.

11. At approximately 6:30 a. m. on May 16, 1977, the JIM BERNHARDT and its tow collided with the Barge PIERCE which was being push-towed by the ST. PHILIP. The collision occurred just north of Mile 143.4 on the lower Mississippi River approximately midway between 50-Mile Point to the north and 48-Mile Point to the south. The movements of each vessel in the moments prior to 6:30 a. m. must be reconstructed in order to understand the cause of the collision.

12. By agreeing to a starboard-to-starboard passing with the BURNETT and a port-to-port passing with the ST. PHILIP, Captain Jones needed to round the bend so that the JIM BERNHARDT could pass between the other two vessels. The BURNETT was proceeding upriver toward the JIM BERNHARDT approximately 400 ft. away from the barges moored on the west bank. Since the fleets of barges extended

out 400 ft. to 600 ft. from the west bank, the navigable channel between the BURNETT and east bank was approximately 1000 ft. to 1200 ft. The ST. PHILIP was a short distance behind the BURNETT, but was travelling 40 ft. to 100. ft. off the east bank. Therefore, the portion of the River through which the JIM BERNHARDT had to navigate was approximately 900 ft. to 1100 ft. wide.

13. The JIM BERNHARDT rounded 50-Mile Point at full throttle and was moving at approximately 10–12 mph. Because of its speed, the current of the River and the starboard-to-starboard passing agreement with the BURNETT, the vessel was strongly favoring the east bank when it came out of the bend. Captain Houston described the movement of the BERNHARDT as "sliding into the bend," and Captain Burnett testified that it was "two-thirds over in the river."

14. Captain Jones was alone at the wheel of the JIM BERNHARDT. He was also handling radar communications and signals and was watching the radar. No lookout was posted either in the pilothouse or on the head of the tow.

15. Captain Jones had visual and radar sighting of a vessel he believed to be the ST. PHILIP. However, he only had visual sighting of the top pilothouse of the vessel since the fog obscured vision below approximately 50 ft. There is no evidence of any other vessel in that immediate area; therefore, the Court concludes that it was the ST. PHILIP that Captain Jones sighted.

16. Meanwhile, as previously mentioned, Captain Houston was steering the ST. PHILIP and the Barge PIERCE upriver at approximately 40 ft. to 100 ft. off the east bank. Marguez Light is located at Mile 143.4 and when passing the point below the light, Captain Houston had to angle his tow out toward the west bank to get around the point.

17. For some undetermined reason, Captain Houston allowed the ST. PHILIP and the Barge PIERCE to angle out farther than expected into the River. It was at this time that Captain Houston saw on his radar the JIM BERNHARDT "sliding into the bend." He immediately began to "twin screw" his engines to pull the head of the barge closer to the east bank. To "twin screw" means to run each engine in an opposite direction so as to pull the head of a tow to one side or the other while the vessel itself ceases forward motion. The JIM BERNHARDT and the ST. PHILIP were approximately one-half mile to one mile apart at this point.

18. An eddy exists between Belle Point (near 48-Mile Point) to Marguez Light, but there is no evidence that it had any effect on the ST. PHILIP.

19. Paul Hyde, the first mate on the ST. PHILIP, had been off duty for a short time and had gone to his quarters when he heard the vessel begin to "twin screw." He immediately went to the pilothouse and began to watch the gyro and man the radio while Captain Houston was attempting to turn the head of the tow back toward the east bank.

20. There were two attempted radio communications between the vessels during the time Captain Houston began "twin screwing" and the moment of collision. Captain Jones called the ST. PHILIP twice just before the collision but received no answer. Mate Hyde, who was manning the radio on the ST. PHILIP, answered but Captain Jones did not hear him because heavy traffic on the River made radio communication difficult. Captain Burnett of the BURNETT heard both sides of the conversation in which Captain Jones attempted to confirm the port-to-port passing agreement and to warn the ST. PHILIP that he believed that it was angled out too far into the River. Mate Hyde answered that they were attempting to turn back in toward the east bank, but Captain Jones did not hear him.

21. At no time did either vessel sound any fog signals. Captain Houston did sound a three-whistle blast, but it was intended to be a "back-down" signal given when he began to "twin screw." Captain Jones sounded a danger signal, but it was only a few seconds before the collision.

22. Shortly after passing the BURNETT, Captain Jones testified that he saw

the ST. PHILIP "shoot out" across the River toward the west bank. On instinct he sounded the danger signal and began to steer his tow toward the east bank. However, Captain Jones had misperceived his radar and visual sighting of the ST. PHILIP. In reality it was sitting more or less stationary with Captain Houston still attempting to move the head of the tow back toward the east bank. The ST. PHILIP did not "shoot out" in front of the JIM BERNHARDT; however, the bow of the Barge PIERCE was angled out approximately 250 ft. to 300 ft. from the east bank at an angle of approximately 25°.

23. The two vessels were in the relative positions described above when the collision occurred at Mile 143.4. The damage from impact shows that the Barge PIERCE was hit mainly on the starboard bow, with most of the JIM BERNHARDT's split flotilla coming down the same side.

24. The width of the River between the BURNETT and the east bank was approximately 1000 ft. to 1200 ft. The collision occurred approximately 250 ft. to 300 ft. off the east bank; therefore, it occurred within the eastern one-fourth of the navigable channel. The JIM BERNHARDT had three-fourths of the channel to pass between the BURNETT and the ST. PHILIP if Captain Jones had only done all that was necessary to effect the agreed upon port-to-port passing with the ST. PHILIP.

25. As a result of the collision, the Barge PIERCE sustained damage as did barges MAT–17 (owned by Mid America Transportation Company); MLC–303, MLC–305, MLC–306 (owned by Continental Marine Corporation); ZKY–108, ZKY–206 (owned by Zito Barge Line, Inc.) and CNC–67, CNC–245–B; CNC–51 (owned by Conti-Carriers & Terminals, Inc.).

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over these consolidated maritime claims under 28 U.S.C. § 1333 and venue is properly laid in the Eastern District of Louisiana. The principles and precedents of admiralty law and the Rules of the Road for vessels operating in the Mississippi River north of the Huey P. Long Bridge, known as the Western Rivers Rules, will be applied. 33 U.S.C. § 301 et seq., 33 C.F.R. § 95.01 et seq. (Pilot Rules for Western Rivers).

2. The JIM BERNHARDT was proceeding downstream at full speed ahead around a right hand bend in fog conditions. The rules require every vessel to go at a moderate rate of speed in fog, taking into account the existing circumstances and conditions. The vessel should use such precautions as will enable it to stop in time to avoid a collision after the approaching vessel comes into view, provided that the approaching vessel itself is going at the moderate speed required by law. 33 U.S.C. § 341; *The Chattahoochee,* 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801 (1899); *Pure Oil Company v. Union Barge Lines Corporation,* 227 F.2d 868 (6th Cir. 1955). The JIM BERNHARDT violated this rule by proceeding full speed ahead into a fog bank and not reducing speed until the moment before impact with the ST. PHILIP. Under the rule of *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873) it was incumbent on the JIM BERNHARDT to show not only that its failure to proceed at a moderate rate of speed in fog conditions did not cause or contribute to the collision, but that it could not have. Under the circumstances the Court feels that the JIM BERNHARDT has not met this burden.

3. A vessel proceeding through fog has the duty to post a proper lookout. 33 U.S.C. § 351; *The Ottawa,* 70 U.S. (3 Wall.) 268, 18 L.Ed. 165 (1865); *Pure Oil Company v. Union Barge Line Corporation,* 227 F.2d 868 (6th Cir. 1955). Neither a captain nor a helmsman in the pilothouse can be considered to be a lookout within the meaning of maritime law. *Bunge Corporation v. M/V Furness Bridge,* 558 F.2d 790 (5th Cir. 1977); *Petition of Harbor Towing Corporation,* 310 F.Supp. 775 (D.Md.1970), *aff'd* 438 F.2d 535 (4th Cir. 1971). A lookout is specially charged with the duty of observing lights, sounds, echoes or any obstruction to navigation. *Sun Oil Company v. S. S. Georgel,* 245 F.Supp. 537 (S.D.N.Y. 1965), *aff'd* 369 F.2d 406 (2nd Cir. 1966). This duty cannot ordinarily be fulfilled by a person who has other duties and cannot

devote his undivided attention to possible dangers. *Grace Lines, Inc. v. United States Lines Company,* 193 F.Supp. 664 (S.D.N.Y. 1961).

 Captain Jones was alone in the pilothouse of the JIM BERNHARDT and was attempting to navigate the vessel, to handle communications, to watch the radar and to serve as a lookout. This is clearly a violation of the rules. Had a proper lookout been posted, either on the head of the vessel's tow or in the pilothouse, perhaps the movements of the ST. PHILIP would not have been misperceived and action could have been taken sooner to avoid a collision. This statutory fault calls for application of the rule of *The Pennsylvania, supra* ; a rule which once again the JIM BERNHARDT has failed to satisfy. The Court finds that the failure to post a lookout contributed to the cause of the collision.

 4. Because the width of the Mississippi River between 50-Mile Point and 48-Mile Point was and is approximately 2000 ft. and the width of the navigable channel between the BURNETT and the east bank was 1000 ft. to 1200 ft., the "narrow channel" rule does not apply. 33 C.F.R. § 95.11.

 5. After the two vessels had agreed to a port-to-port passing, it was the duty of each vessel to steer to its half of the navigable channel so that the vessels could pass safely. This should have been the expectation and understanding of each vessel after the passing agreement was made. Each vessel could assume that the other would act reasonably, exercise due care and navigate according to its announced intention. *Board of Commissioners of the Port of New Orleans v. M/V Farmsum,* 574 F.2d 289 (5th Cir. 1978); *CIA. Maritima San Basillio S. A. v. Shell Canada, Ltd.,* 490 F.2d 173 (1st Cir. 1974); *Slade, Inc. v. Mississippi Valley Barge Line Company,* 296 F.2d 188 (5th Cir. 1961).

 However, because of its excessive speed, its starboard-to-starboard passing agreement with the BURNETT and the River current around 50-Mile Point, the JIM BERNHARDT was over too far into the half of the navigable channel reserved by the port-to-port passing agreement for the ST. PHILIP. At this point the vessels were a few minutes apart and a safe port-to-port passing was still possible; however, Captain Jones further complicated an already dangerous situation through his misperception of the movement of the ST. PHILIP. Believing that the ST. PHILIP was "sheering" away from the east bank and cutting across the path of the JIM BERNHARDT, Captain Jones steered the JIM BERNHARDT toward the east bank to effect a starboard-to-starboard passing. The overall failure of Captain Jones to exercise ordinary care and do what was necessary to effect a port-to-port passing was the cause of the collision. This failure places the entire fault on the JIM BERNHARDT. *In re Blackman,* 437 F.2d 542 (5th Cir. 1971).

 Captain Houston had allowed the head of his tow to angle out into the River approximately 250 ft. to 300 ft.; however, this was not the cause of the collision. If the JIM BERNHARDT had acted reasonably and with ordinary care to pass port-to-port with the ST. PHILIP, the collision would have never occurred despite the angle of the ST. PHILIP. The fault producing liability must be contributory and a proximate cause of the collision and not just fault in the abstract. *Board of Commissioners of the Port of New Orleans v. M/V Farmsum, supra.* Ideally, Captain Houston should have kept his tow parallel with the east bank, but his failure to do so was not a contributing nor proximate cause of the collision due to the fact that the JIM BERNHARDT was three-fourths of the way over into the navigable channel. All of the actions of the ST. PHILIP took place in only one-fourth of the navigable channel leaving three-fourths of the channel for the JIM BERNHARDT to pass. Under circumstances such as this, the ST. PHILIP cannot be held liable.

 6. The ST. PHILIP did not have a lookout posted on the head of its tow, but Mate Hyde was in the wheelhouse a short time before collision watching the radar. The Court feels that this arrangement did not satisfy the duty of a vessel to have a proper lookout. 33 U.S.C. § 351; *The Ottowa, supra; Pure Oil Company v.*

*Union Barge Line Corporation, supra.* This statutory violation brings into play the rule of *The Pennsylvania*; however, the Court finds that the failure of the ST. PHILIP to post a proper lookout could not have contributed to the collision in light of the reasons discussed above. A vessel can be negligent for failure to have a proper lookout, yet not at fault where what the lookout would have seen was already known. *Ellis Towing & Transportation Co. v. Socony Mobil Oil Co.*, 292 F.2d 91 (5th Cir. 1961).

7. The ST. PHILIP did not sound any danger signals as required by 33 U.S.C. § 349(a) and 33 C.F.R. § 95.09. The Court finds that this failure could not have contributed to the collision since the JIM BERNHARDT had radar and visual sighting of the ST. PHILIP and because the knowledge of the danger by the ST. PHILIP came too late for it to sound an effective danger signal. The JIM BERNHARDT was fully aware of the impending danger; therefore, a danger signal by the ST. PHILIP could not have helped prevent the collision. *The Pennsylvania, supra.*

8. The JIM BERNHARDT did not sound the danger signal until a few seconds before impact. This signal was not timely as required by 33 U.S.C. § 349(a) and 33 C.F.R. § 95.09, but the Court finds that this failure could not have contributed to the cause of the collision since even with adequate warning, there was nothing more the ST. PHILIP could have done to avoid the collision. *The Pennsylvania, supra.*

9. Because the navigational errors of the JIM BERNHARDT were the sole cause of the collision, it follows that the owner of the JIM BERNHARDT, Wisconsin Barge Lines, Inc., is liable for all of the resulting damage.

10. Since the Court finds the JIM BERNHARDT solely at fault, there is no need to apply the decision of *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

Accordingly, based on the foregoing Findings of Fact and Conclusions of Law,

It is hereby ORDERED that preparations proceed for trial on the issue of damages, and thereafter, Judgment issue.